## LANFEAR et al. *v.* BLOSSMAN.

Where a bill of exchange drawn on a shipment and payable a certain number of days after sight, is sold with the bill of lading appended to it, the holder of the bill of exchange cannot, in the absence of proof of any local usage to the contrary, or of the imminent insolvency of the drawee, require the latter to accept the bill of exchange but on the delivery of the bill of lading; and where, in consequence of the refusal of the holder to deliver the bill of lading, acceptance is refused and the bill protested, the protest will be considered as made without cause, the drawee not having been in default, and the drawer will be discharged. An instrument, with such a condition appended to it, is not strictly a bill of exchange: it wants the essential requisite of being negotiable and payable at all events, independent of its consideration.

APPEAL from the Commercial Court of New Orleans, *Watts*, J. This was an action against the defendant as drawer and endorser of a bill of exchange, to recover the amount of the bill, with damages, interest, and costs of protest. The petition was in the usual form. The bill sued on was in the following words;

B L       29 MAY       B 2106.

        Bill of lading of 344 B. cotton, per Provincialist
First         attached hereto.

Exch'e. for £3324, 4, 3 Stg.      New Orleans, Feb. 23, 1844.

    Sixty days after sight of this first of exchange, (second and third unpaid,) pay to the order of myself three thousand three hundred and twenty-four pounds, four shillings and three pence sterling, value received, and charge the same to account as advised by

        Your ob't. serv't.,

             R. D. BLOSSMAN.

To Messrs. Fermin de Tastet & Co.
  No. 33.         *London.*

      (Endorsed)

Pay to the order of Messrs. *A. Lanfear & Co.*, value received, New Orleans, ut retro.           R. D. BLOSSMAN.

Pay to the order of Messrs. *Prime, Ward & King*, value on account, New Orleans, ut supra.         AMBE. LANFEAR & Co.

A subsequent endorsement to *Baring, Brothers & Co.*, was erased.

The answer alleges that, the house of *De Tastet & Co.*, of London, in October, 1843, by letter, authorized the defendant to purchase for their account, cotton to the extent of 2500 bales, and to draw bills on them for the amount of the invoices of any cotton so purchased and shipped to them; that, in pursuance of this authority, defendant, in the months of January and February, 1844, purchased for them 2387 bales of cotton, and drew bills on them for the payment of the price; that, among the purchases and shipments so made, was one for 344 bales, for the amount of the invoice of which the bill described in the petition was drawn; that, in order to negotiate said bill with advantage, and, in accordance with the custom of merchants, to secure to the holder the acceptance of the drawees, defendant agreed with plaintiffs, who purchased said bill, to deliver to them the bills of lading for the cotton on which the bill of exchange was drawn, it being well understood, and such being the course of trade and custom among merchants, that the bill of lading should accompany the bill of exchange into the possession of any person to whom the bill of exchange might be negotiated, and be retained until the acceptance of such bill of exchange, and that upon such acceptance the bill of lading should be delivered to the acceptors, that they might take possession of the cotton and dispose of it as they might see fit.

The answer further avers that, the bill of exchange was forwarded by the plaintiffs to *Baring, Brothers & Co.*, of London, to be presented by them for acceptance, and that the drawees thereupon offered to accept it, but, upon asking for the delivery to them of the bill of lading, *Baring, Brothers & Co.*, who were the agents of plaintiffs and for whose acts the plaintiffs are responsible, declared that they would not deliver up the bill of lading unless the drawees would discount their acceptance, and pay the amount thereof, less the discount, in cash; that the condition thus attempted to be imposed by the holders upon the drawees was arbitrary and unjust, and without any foundation in the custom of merchants, which could only authorize such a pretention in case of the acceptors' credit being doubtful or suspected, which was not even pretended by the plaintiffs or their agents, the credit and solvency of the drawees being beyond all question, and their standing among the first of London merchants; that the drawees, indignant at a demand which implied a distrust of their character and standing, refused to accede to the condition, but persisted in repeating their offer to accept on the delivery of the bill of lading, which delivery being refused, the bill of exchange was protested for non-acceptance, and the name of the defendant as a merchant dishonored and his credit and business injured; that the plaintiffs, or their agents, retained the bill of lading and took possession of the cotton, and have disposed thereof in some manner to him unknown; that, by reason of the premises, he has been discharged from all liability under said bill of exchange, which would have been accepted and paid according to its tenor, had the acceptance and payment not been prevented by the tortious acts of the plaintiffs, or of those for whose acts they are responsible.

A prayer in reconvention, with which the answer concludes, was afterwards discontinued, the defendant reserving his right to claim damages in a subsequent action.

The evidence on which the case was tried, so far as necessary to a correct understanding of the decision, will be found in the opinion delivered by EUSTIS, C. J.

The Commercial Court gave a judgment against the plaintiffs, from which they appealed.

*L. Peirce*, for the appellants.  A bill of exchange is a contract by which the drawer binds himself that the drawee shall accept and pay the bill, or that he will do it on his default.  The bill of lading is a collateral contract, and security for the *principal* obligation, the contract evidenced by the bill of exchange—for the *whole contract*, and not for a part of it, unless it be so expressly understood and agreed.  Such a separation cannot be implied from the mere taking of the security, because the presumption of law is that, when a security is given for the fulfilment of a contract, it is for the *whole* contract.

When a bill of exchange is purchased simply, it is on the faith of the drawer's ability to make good the contract, or on the faith that the drawee has authorised the drawer, and is able to pay, or on both combined; or, in other words, on the faith of the joint or several ability and responsibility of the drawer and drawee.  If a security is exacted, the plain inference is, that the purchaser had not that faith in the joint or several ability and responsibility of the drawer and drawee to fulfil the contract—the *whole* contract, and not a part of it.

It would not be for a part (the acceptance,) because the bill being drawn by authority of, and for the amount of, purchases for the drawee, he was bound to *accept*.  He was in law considered as having accepted, and the hand-writing of his acceptance on the bill would not have added to his obligation, already incurred by his authority to the drawer.  This would be the case were the bill bought simply and without the bill of lading, and the party would have his recourse both on drawer and drawee, even though acceptance and payment were refused.  Being therefore sure of acceptance, or there being a legal obligation on the drawee to accept, which is equivalent to an actual acceptance, there could be no object in taking a security for that purpose; and the only other part of the contract being payment, it is clear that was the principal object of the security, and that the doubt on the purchaser's mind was not of the acceptance, but of the payment.

If the drawee authorised the drawer to purchase for him and draw for the price, it is clear that he must take all the inconveniences attending the negotiation of the bill drawn by his agent, i. e. the pledge of the bill of lading, and that, buying on credit he must be content with the estimation placed upon his ability in the market.  He was bound to accept, although he did not get the bill of lading on acceptance, because his agent was forced to negotiate it in that way, and had a right to do so, for it was in the regular course of the trade, and within the scope of his authority.  If he exceeded his authority, then he is bound without reference to the bill of lading at all, as drawer.

The position contended for by the drawer would have the singular effect of putting the purchaser of a bill with security, in the same, or in a worse category, than if he had taken it simply; for, if taken simply under authority to draw, the acceptance was sure, or the authority was equivalent to it, and the party would run his chance for the payment; if the security were to be given up on acceptance, he must then run his chance in the same manner, and the two cases are in the same category.  He would be in a worse situation, if the security is to change the negotiability of the bill, and turn it into a conditional contract.

It is said both by counsel for the defendant, and by the judge who argues their case so fully, that no attempt was made to discredit *De Tastet & Co.*  The *onus* had been assumed by defendant to prove that they were of high credit·

This is not proved; but that they were of doubtful credit, is established by the defendant's evidence.

*Benjamin* and *Micou*, for the defendant. The bill of exchange having been discounted, and a bill of lading delivered with it, both papers must be consulted to ascertain the agreement between the parties. They constitute together one agreement. Chitty on Contracts, p. 75. *Hunt* v. *Livermore*, 5 Pickg. 395.

*Lanfear & Co.*, the plaintiffs, having received the bill from defendant, it is immaterial to inquire as to equities of other holders. If they negotiated the bill, its return to their hands places them in the same position as if they had never parted with it. The question is not one purely dependent on the law of bills of exchange. These, and the obligations growing out of them, may be, and in practice constantly are, modified by collateral engagements. That the holder of the bill of exchange, contracted some obligation by receiving the bill of lading, is granted on both sides. That his obligation was to deliver the bill of lading to the acceptors, is equally agreed and conceded. The point in dispute is, the time of delivery. The plaintiffs contend that the bill of lading is only to be delivered on payment. The defendant, that it should have been delivered on acceptance. The law of bills of exchange gives no assistance in solving this question of time. That law is applicable to bills not affected by collateral agreements. When such agreements exist, their construction depends upon their language, if express, or on the circumstances, if implied. The collateral agreement, in this case, results from the facts, and is implied. To ascertain what was the agreement, we must consider the nature of the transaction, and the circumstances and position of the parties. In accepting the bill of lading with the bill of exchange, the plaintiffs are presumed to have submitted to the consequences necessarily resulting from such acceptance. Civil Code, art. 1810. *Durrive* v. *Freret*, 11 La. 378. *Bank of Port Gibson* v. *Burke*, 4 Rob. 442. What are the consequences, or necessary implications resulting from the transaction? It is conceded by the plaintiffs that the delivery of the bill of lading, with the bill of exchange, implies that the bill of exchange is drawn against, or based upon the shipment. So much being understood, the transaction can only assume three aspects, viz :

1st. The drawer consigns, on his own account, merchandise to be sold by the drawee.

2d. The drawer has sold the merchandise to the drawee, and the bills represent the price to be paid.

3d. The drawer is acting as the factor of drawee, and having purchased for account of the latter, draws and negotiates the bills for the price of the goods advanced by him.

In the first case, the drawee, according to the law merchant, is under no obligation to accept, unless he is placed in funds at the time of acceptance. The holder does not take the bill upon a general, or presumed, or secret authority to draw. The bill of lading placed in his hands, disclosed to him the nature of the authority, and knowing that it was the basis of his bill of exchange—the property against which it was drawn—that without receiving the property the drawee is not bound to accept, it would seem inevitable that, he was bound to tender the bill of lading when he demanded acceptance.

In the second case, the drawee having purchased the property, the term allowed by the bill of exchange, indicates that the sale was made on credit. The holder of the bill of lading has assumed a mandate, to wit, that of comple-

LANFEAR
v.
BLOSSMAN.

ting the delivery of the goods sold. If so, he must deliver them, when he asks the obligation or acceptance of the purchaser. The sale on credit implies the right of the purchaser to the possession during the term of credit—else he runs all the risk of loss, without having the chances of profit. The vendor cannot sue until the price is due. Chitty on Bills, 95. *n.* And having taken bills for the price, he cannot sue on the original contract, disregarding the bills, and before maturity. *Ibid.* If he has sold on credit, and draws, before the credit has expired, for the price, he is considered as drawing without funds, and not entitled to notice of dishonor. Story on Bills, p. 350, and *note*, quoting Chitty on Bills.

In the third case, the law is substantially the same. The drawer acting as factor, has completed his mandate by purchasing and shipping the goods, and negotiating his bills. His only remaining connection with the transaction, is his eventual responsibility on the dishonor of his bills. In this case again, the drawee is the purchaser, entitled to the benefit of the term of credit implied from the face of the bill of exchange, and to receive delivery on acceptance.

In all the three cases, we give to the holder of the bills the highest right over the property that can evist, consistently with an obligation to deliver it on a contingency to another. We consider him subrogated to all the rights of the parties previously interested. He has the control of the property; he stands in the position, of the vendor or owner. He treats it as his own, with no limitation except such as results from the bill of exchange. The vendor or owner would in either of the cases supposed, be unquestionably bound to deliver on acceptance. Can the holder of a bill of lading—the mandatory for the completion of a sale—acquire, by subrogation, higher rights than his authors possessed?

The plaintiffs' claim rests upon the existence of an absolute right to retain the consignment until payment. The defence does not assume an absolute and unqualified obligation to deliver the goods on acceptance. On the contrary, we admit a right to retain in a particular case, to wit, the insolvency of the drawee. The holder is not bound to give over the goods for the name of an insolvent house. By the French law and our own, the vendor who has agreed to sell on credit is bound for the delivery, unless the purchaser has become insolvent, so that imminent danger exists of losing the price, *since* the sale was agreed upon. If he sell to a person already insolvent, say the French writers, he must still deliver. It is the fault of his own improvidence, or neglect to inquire into the circumstances of the vendee. Civil Code, art. 2464. Code Nap. art. 1613, and Rogron's note. *Cook* v. *West*, 3 Rob. 331. 2, Pothier sur Vente, No. 67. 16 Toullier, p. 315, No. 268.

By the law of England the vendor's right to detain, is called stoppage *in transitu*, and exists only in cases of insolvency. Cross on Lien, title Stoppage &c. Abbott on Shipping, same title. *Walley* v. *Montgomery*, 3 East 585. The law is very clearly stated by *Sir William Scott*, in the case of *The Constantia*, 6 Robinson's Admiralty Rep., 321, quoted at large in Abbott on Shipping, tit. Stoppage *in transitu*, p. 517, London edition of 1844. The holder of a bill of lading is considered as standing in the place of the vendor of the goods. Abbott on Shipping, same title. 1 Smith's Leading Cases, 396–7, 401–2, 405–6, 414–5. Cross on Lien, 364, vol. 34 Law Lib.

We thus concede to the holder of the bills, rights of a very high order, but still regulated and controlled by positive provisions of law. The rights claimed

for him by the plaintiffs are undefined. and may be exercised wantonly, capriciously and oppressively. We claim only that the holder is bound to exercise a legal discretion, as to delivery of the bill; the plaintiffs contend that, he has a right to hold them in all cases. It is in vain to say that the discretion imposed is of a delicate and unpleasant nature. Those who engage in commerce must not attempt, on such pleas, to escape the responsibilities arising from their business. That the desire to escape such responsibility has given rise to the attempt by the *Barings*, and other houses in England, to change this law of commerce, is obvious from the testimony in this case.

The plaintiffs assumed the *onus* of proving the custom, to retain at the will of the holder. An examination of the evidence will show that the attempt was a signal failure. If we have correctly stated the law, deduced from the implied contracts and acts of the parties, it would be extremely difficult, if not impossible, to change the law by proof of custom. Custom against law will not be admitted, or will a custom to violate a contract. As to the requisites of a custom, so established as to become a part of the law, see Chitty on Contracts, p. 82. 2 Smith's Leading Cases, p. 224. 1 Duer on Insurance, p. 258, § 54, and note citing 2 Burr. 2 Phillips, &c.

If the foregoing position be correct, the acceptance of the bill of exchange having been tendered on delivery of the bill of lading, and the holder having refused to deliver it, he has prevented the acceptance by his own wrongful act, and the drawer is therefore released. The drawer promised an acceptance *on a condition*. The party refusing to perform the condition discharges the other party. Civil Code, arts. 1810, 2035. *Oxnard* v. *Locke*, 13 La. 447. *Vance* v. *Tourné, Ibid*, 229.

No serious attempt was made to prove that the drawees were insolvent, or even embarrassed. On the contrary, all the bills accepted on receipt of the consignments, were promptly paid. The house is still in good credit and extensive business ; and, the proof is positive and direct that the bills would have been paid, if they had been accepted.

The judgment of the court was pronounced by

EUSTIS, C. J. This is an action brought by the holders against the endorser, who was also the drawer, of a bill of exchange for $3324 4s. 3d., drawn in New Orleans on *Fermin de Tastet & Co.*, of London, at sixty days after sight, and dated 23d February, 1844.

The bill of exchange was purchased by the plaintiffs from *Blossman*, the drawer and endorser, in New Orleans ; and with it the bill of lading, upon which the bill of exchange was drawn, was delivered by the broker who made the bargain between them.

The bill of lading was for 344 bales of cotton, shipped by the *Provincialist*, and was endorsed in blank. The bill of exchange was also endorsed in blank.

The bill of exchange, accompanied by the bill of lading, was remitted to *Prime, Ward & King*, of New York, and by them negotiated to *Baring, Brothers & Co.*, of London. *De Tastet & Co.* offered to accept the bill on presentation, but insisted on having the bill of lading delivered to them. This was declined, and the bill was protested for non-acceptance, and subsequently for non-payment.

The cotton was taken possession of by *Baring, Brothers & Co.*, under the bill of lading, and disposed of. It not producing a sufficient sum to satisfy the

LANFEAR
*v.*
BLOSSMAN.

bill, this suit was instituted for the recovery of the amount thereof, with damages, interest and costs.

We shall not decide the question as raised on the sufficiency of the notice, as it was not urged at bar. It was admitted on the trial, that the defendant was entitled to a credit on the bill for £2120 2s. 3d., to date on the 16th September, 1844.

There was judgment in the court below for the defendant, and the plaintiffs have appealed.

The question which has been argued before us, and on which the case is held to turn, is, whether *De Taslet & Co.* had a right to insist on the delivery of the bill of lading on accepting the bill of exchange ; or, in other words, whether *Baring, Brothers & Co.*, had a right to retain the bill of lading until the payment of the bill of exchange.

The facts are so few and simple that there is no necessity to refer to them particularly ; the subject can be examined in the abstract under the different views which have been presented to us by counsel.

It is proved that had the bill been accepted at the time of its presentation, it would have been paid ; and the only obstruction to its acceptance and payment arose from the course adopted by *Baring, Brothers & Co.*, in relation to the acceptance. We do not consider the evidence as seriously affecting the credit of *De Taslet & Co.*, so far as the rights of the parties to this suit are concerned.

But we must first disembarass the case of some questions that are not immediately connected with the subject, under the point of view in which we shall determine it. Both parties rely upon an usage, which each insists is established by conclusive evidence in his favor. On this subject of an usage, or custom of trade, which is to control and regulate the rights of the parties, we concur with the learned judge of the Commercial Court, in adopting the language of Judge *Story*, in the case of the schooner Reeside, 2 Sumner's Rep. p. 569.

"I am, myself, no friend to the almost indiscriminate habit of late years, of setting up particular usages or customs, in almost all kinds of business and trade, to control, vary or annul the general liabilities of parties, under the common law, as well as under the commercial law. It has long appeared to me, that there is no small danger in admitting such loose and inconclusive usages and customs, often unknown to particular parties, and always liable to great misunderstanding and misinterpretations and abuses, to outweigh the well known and well settled principles of law. And I rejoice to find that of late years the courts of law, both in England and America, have been disposed to narrow the limits of the operation of such usages and customs, and to discountenance any further extension of them. The true and appropriate office of a usage or custom is, to interpret the otherwise indeterminate intentions of parties, and to ascertain the nature and extent of their contracts, arising, not from express stipulations, but from mere implications and presumptions, or acts of a doubtful or equivocal character," &c. And again, in *Donnell et al.* vs. *Columbia Insurance Company*, 2 Sumner's Rep. p. 377 : "Usages among merchants should be very sparingly adopted as rules of law by courts of justice, as they are often founded on mere mistakes, and still more often in the want of enlarged and comprehensive views of the full bearing of principles."

We have examined the testimony of the witnesses with attention, and have come to the conclusion that, so far from establishing the existence of an usage or custom on this subject, the evidence proves that it is involved in great doubt and

uncertainty, even in the minds of experienced and judicious merchants. The fact of private agreements being exacted authorizing the retention of the bills of lading accompanying bills of exchange, and of instructions being required by the bankers in London in relation thereto, tend to show an unsettled state of opinion touching the rights and liabilities of the parties to the bills.

In relation to bills of exchange drawn in the East Indies and accompanied by bills of lading. the usage to retain the bills of lading until payment of the bill is proved to exist. But this case appears to us to present an exception, and not the rule itself, as to all bills accompanied by bills of lading. Nothing could more strongly indicate this state of things than the errors of opinion into which intelligent persons have fallen, in respect to the unlimited power with which the holder of the bill of exchange is supposed to be invested, under all circumstances, and which several respectable witnesses maintain with unquestionable sincerity.

Those witnesses who testified most strongly for the plaintiffs on the point of custom or usage, went no further than to say, that the matter lay wholly in the discretion of the bill holder in England; but they all admitted that it would be considered unusual to refuse to give up the bill of lading, if the house accepting had a first rate standing.

The position assumed by the plaintiffs is that, on acceptance of the bill of exchange, it is in the absolute and entire discretion of the bill holder, or his agent in London, to give up the bill of lading, or retain it until final payment.

This position is suicidal; for if the bill holder, or his agent, has the absolute right to retain the bill of lading, to give it up in any instance would be to discharge every previous name upon the bill. What merchant, whatever might be his standing, whether a friend or indifferent to the agent in London, could expect him to do an act which would involve such consequences? It is also to be observed that, in customs and usages of trade there is no such thing as discretion; they are absolute, imperative and universal, in favor of, and against all the parties to the contract, when no special agreement to the contrary is made. It is clear that if there existed any such custom, or usage of trade, to retain the bill of lading until the payment of the bill of exchange, if the bill of lading was given up in any case before payment, the drawer and every endorser would be discharged, because their rights would be impaired. The giving up of the bill of lading on the acceptance cannot be *optional* with the holder of the bill of exchange. He is bound either to give it up, or to retain it.

The supposed difficulties in this case arise from a course of business which has of late years grown up in this city, in operating the change of ownership of the produce shipped to this mart for sale. This great mutation of property is produced by means of bills of exchange; and when the credit of the drawer of the bill is not sufficient to give it currency, a bill of lading for the produce on which the bill is drawn is appended to it, and sold with it; so that the holder has not only the names on the bill for his security, but the bill of lading and the shipment it represents.

The movement of the market being thus accomplished by means of bills of exchange, it is obvious that when a bill of exchange, with a bill of lading appended to it, is sold, the fair inference is that the drawer could not have sold his bill without the additional security of the bill of lading, or that the purchaser would not take it without such security, and that the bill represents either the price of the property sold, or the reimbursement of the price to some party. The holder of the two bills then has in his possession the property and the ob-

LANFEAR
v.
BLOSSMAN.

ligation for the price, and with these in his hands presents himself to the drawee of the bill of exchange, and demands its acceptance.

Now the merchant on whom the bill is drawn, has either authorized the purchase of the shipment, or he has not. If the shipment is on his account, he is only bound to pay for it at the expiration of sixty days after the presentation of the bill; and is entitled to this credit on the face of the contract to which his direct obligation is demanded. If it is not on his account, the drawer stipulated for him the same term of credit on his acceptance of the bill, and no other conditions can be exacted from him by the holder. In either case, how can the drawee of the bill be required to give out his name unconditionally for the price before the property is delivered to him, or how can the holder of the bill exact from the acceptor his obligation for the price, and retain the thing for which the obligation is given? To say nothing of the unreasonableness of such a supposition, the incompatibility of such a state of things with commercial transactions among persons of credit, is so palpable as to render its existence problematical. Nor is there any thing forced in assimilating the holder of the bill of lading to the vendor. The holder of a bill of lading like this, is considered as standing in the place of the vendor by the English law. Abbot on Shipping, tit. *Stoppage in transitu*. Gross on Liens, tit. *Stoppage in transitu*, and cases there cited. But if we consider the position of the drawee of the bill, the same conclusion forces itself upon us. If the shipment is his, or has been ordered by him, the transfer of the property to him is the consideration of the acceptance which he is to give out, and, if it be on account of others, the consignment is the consideration—the benefit which he derives from the commission and profits, for doing the business of other persons. The property is his guarantee against loss, and he has sixty days to dispose of it, and apply the proceeds to the payment of the bill of exchange drawn on him. *Mason* v. *Hunt*, 1 Douglas, 299.

We believe there is no instrument, the relations of the parties to which are so frequently changed by parol evidence, as bills of exchange. The whole doctrine of accommodation bills, and the enquiry into the consideration of bills, prove this fact beyond contestation. The rule is properly confined to the original parties to the bills, and to those who have received the bills under notice.

" What circumstances will amount to actual or constructive notice of any defect or infirmity in the title to the bill, so as to let it in as a bar or defence against a holder for value, has been a matter of much discussion and of no small diversity of judicial opinion. It is agreed on all sides that express notice is not indispensable, but it will be sufficient if the circumstances are of such a strong and pointed character as necessarily to cast a shade on the transaction, and to put the holder on enquiry." Story on Bills of Exchange, § 194.

The value of a bill of exchange, as such, depends solely upon the certainty of its being paid at all events, and its being entirely independent of the original consideration upon which it was drawn. This is the element of its circulation, and of its being used as a part of the currency, in all mercantile operations. The difficulty in this case arises from the attempt to make the bill, which is drawn on a particular shipment, with its consideration in a manner appended to it, and held and retained by the holder of the bill as a security without which he would not have taken the bill, a current bill of exchange, forming a part of the commercial currency, passing from hand to hand like a bank note, without any reference to, or connection with, its original consideration.

It is not pretended that the bill of lading connects, in any manner, the holders of the bill with any of the other transactions relating to the property which it represents; but it is said that, in this case, the bill of exchange having been discounted with the bill of lading, both instruments must be consulted in order to ascertain the agreement between the parties, they constituting, in fact, but one contract.    The judge of the Commercial Court has thus given his views on this subject:

LANFEAR
*v.*
BLOSSMAN.

"I shall examine the question presented in this case under both points of view.    First, what are the legal consequences and inferences to be deduced from the act of the drawer of a bill of exchange and shipper of cotton, presenting such bill of exchange, accompanied by a bill of lading, to a capitalist or banker fer discount.    In such an act there is a direct implication that, the bill of exchange is drawn against the property covered by the bill of lading; in such cases the property covered by the bill of lading, or, to avoid periphrasis, we will say, the cotton, is either bought by virtue of orders given by the foreign house on whom the bill is drawn, in which case the bill of exchange is to be considered as drawn to pay for the cotton, or else it is a shipment by the drawer of a bill of exchange, of cotton bought for his own account and risk, and the bill of exchange is to be considered as a demand upon the English house, to make an advance upon the cotton thus shipped to their consignment.    If the cotton has been bought by virtue of orders given, it is easy to perceive that the English house may refuse to accept, on the ground that their orders have been violated or departed from in some particulars, which violation or departure authorizes them to refuse acceptance.    In the present case a very intelligent witness gave it as his opinion that, the orders had been violated, so as to authorize *De Tastet & Co.* to refuse acceptance; perhaps I do not concur in this opinion, and I do not cite it as bearing upon the case, because acceptance was not refused on that ground, but only to illustrate the general principle of the risk which buyers of these bills run, when they purchase or discount them.    On the other hand, if the bill of exchange is a demand for an advance on the shipment made on the shipper's account, the house on whom the bill of exchange is drawn may refuse to accept, because it considers the advance exceeds the value of the property, which may also come to a falling market, and the house may be unwilling to become the creditors of the drawer of the bill of exchange.    The bill of exchange in its inception is an incomplete contract, and is only rendered complete by the acceptance of the person on whom it is drawn.

"It is manifest that such are the facts and circumstances out of which the double contract springs, and that they ought to regulate and govern the rights of the parties."

In relation to this undoubted and well known origin of bills of this sort, the testimony of the witnesses of the plaintiff is not unimportant.    *E. J. Forstall* says:  "He has done a great deal of business in exchange.    Is of opinion that bills of lading are the security for the payment of bills of exchange.    Houses to whom bills of exchange are sent, always prefer instructions being sent as to giving up bills of lading when acceptances are made; otherwise they are placed in a position of responsibility by giving them up on their own account."    Being asked by the court whether, when a bill of lading accompanies a bill of exchange, it is or is not a direct implication that the bill of exchange is drawn against the property covered by the bill of lading, the witness answered in the affirmative.

*Samuel Nicholson* has been a large dealer in exchange in New Orleans, since 1837. " *The practice of attaching bills of lading of cotton to bills of exchange is very common.*"

*Edward Shiff :* " *When he receives a bill of exchange accompanied by a bill of lading, considers the former drawn upon the property represented by the latter.*"

*Frederic Frey :* " The bill of exchange is *predicated on the cotton* represented by the bill of lading."

*James Conrey* " considers a bill of lading accompanying a bill of exchange, according to common usage, security for the acceptance and payment of such bill."

*Rutson Maury* " has sold bills of exchange with bills of lading, without any specific agreement."

*James R. Behn* " is of opinion that bills of lading, when attached to bills of exchange, stand as security for both acceptance and payment."

*Faures,* a witness of the defendant, negotiated the bill to the plaintiffs. He says : " On a little hesitation being exhibited by the latter *(Lanfear),* I proposed to get the bill of lading from *Blossman,* when the money was paid."

The bill sued on was forwarded by the plaintiffs to *Prime, Ward & King* of New York, and by their clerk this memorandum was written on it : " Bill of lading for 344 B. Cotton, p. Provincialist, attached hereto."

The bill was negotiated by *Prime, Ward & King* to *Baring, Brothers & Co.,* of London. Being the judges of the facts as well as of the law, we are not permitted to impute to that eminent house any want of knowledge concerning the course of trade in bills of exchange, accompanied by bills of lading of cotton shipped from this port to its market abroad. In this case the memorandum on the bill of exchange fixed its character beyond any reasonable doubt.

In determining the question as to the right of the holders of the bill of exchange to withhold the bill of lading after the acceptance of the former was tendered, we are at a loss for any *positive* authority of decisions in the English courts.

We have not been favored with the opinions of any counsel in England on this subject, which could easily have been had, and which would have been of great assistance to us. We must decide according to the lights we have before us.

There does not appear to be any controversy about the right of the holder of the bill of exchange to retain the bill of lading, in case of the imminent insolvency of the drawee. The counsel who argued this case did not differ as to the course the holder might, for his security, adopt, in such a state of things.

It is imposible for us, under the evidence and our own positive knowledge of what is passing every day under our eyes, to consider this transaction otherwise than as one and indivisible, and that *Baring, Brothers & Company,* so far as any obligations on their part resulting from the possession of the bill of lading are concerned, were in the situation of the original purchasers of the bill of exchange, of which the bill of lading and the memorandum on the bill of exchange gave them full notice ; and that they were bound to know and well knew, what the respectable witnesses of the plaintiffs concur in opinion about, as to the origin and character of these hybrid instruments.

The hypothesis which isolates the bill of exchange from all the facts with which it originated, and separates it from the shipment upon which it was

drawn, we cannot consider as tenable.   Are the drawees bound to accept before
the bill of lading was presented to them ?   Suppose accident, or bad faith, were
to have separated the two instruments—suppose each of them to be negotiated
to different persons, for value—could the holder of the bill of exchange alone
insist on the acceptance, when the bill of lading should be outstanding ?

The holder of the bill insists that he is not bound to part with his main secu-
rity, and the acceptor that he is not bound to accept without having the consign-
ment, which is the consideration of his becoming a party to the bill, by putting
his name out.   In the one case, the holder runs the risk of the credit of the
parties to the bill ; in the other, the acceptor that of the good faith of the holder,
who by putting the bill of lading in circulation, may deprive the acceptor of the
property, which the acceptor has a right to have applied to the payment of the
bill.

It is urged that, by considering the bill of exchange as dependent on the bill
of lading, the doctrine of the negotiability of bills of exchange, as established
by the law merchant, is violated.   But this is the very question in dispute, which
is, whether this bill *is a bill of exchange* in the mercantile sense.   It wants the
essential requisite of a bill of exchange, which is that it is negotiable and paya-
ble at all events, independent of its consideration.   A bill, with a condition like
this appended to it, with a concomitant agreement from which it cannot be
separated, may be called a bill of exchange, but it wants the requisites which
alone give it value and circulation as such.

The case cited of *Mason* v. *Hunt*, determined by the Court of King's Bench
in 1779, and which we are not aware ever to have been overruled, was tried
before *Lord Mansfield* at Guildhall, and the opinion of the court was delivered
by him after a full argument at bar.   It was by that able and learned bench de-
cided, " that an agreement to accept a bill on certain conditions, is discharged
if the conditions are not complied with ; and if there is a virtual acceptance, on
consideration that goods shall be consigned to the acceptor to answer the bill,
together with a policy of insurance on them, the holder of the bill by taking to
the goods and selling them discharges the acceptance."   1 Douglas, 296.

In this case the dependence of bills of exchange on agreements imposing con-
ditions connected with their consideration, is expressly recognized.   "An
agreement to accept is still but an agreement ; and if it is conditional, and a third
person takes the bill knowing of the conditions, he takes it subject to such con-
ditions," says Lord *Mansfield*.

"After a refusal to accept the bills drawn, and a negotiation of two or three
days, the holder and drawees of the bills signed a memorandum by which the
former took the bill of lading and policy of insurance, and undertook to apply
the proceeds of the property, as far as they would go, in part payment of the
bills.   There was a deficiency; and this action was brought against the defend-
ants, as acceptors of the bills drawn on the consignment, for the difference ; and
the court came to the conclusion that, if there was an acceptance, the conduct
of the holder of the bills of exchange, under the memorandum and agreement,
discharged them."   In the conclusion of the opinion, the Chief Justice remark-
ed : " The temptation to accept was the commissions on the consignment, or
they (the defendants) were to have the security of the goods and the insurance.
But the plaintiff undoes all this and says : ' Then I will take all from you,
security, commissions,' &c.   This was saying : ' I will stand in your place,
but not so as to be answerable for more than the produce of the tobacco.'   It

LANFEAR
*v.*
BLOSSMAN

is impossible the defendants could mean to accept, without any benefit or security. We are all clear that this made an end of the agreement."

In this case the bill of lading was delivered up by the party sought to be made liable *as acceptor*, and there was a previous agreement of which the holder had notice.

The facts in the case of *Mason* v. *Hunt* are not in many respects similar to those under consideration. What was made out by positive testimony in that case, we arrive at in this by necessary implication. But some of the main reasons given in the opinion of Lord *Mansfield* are the same to which we have arrived, in investigating, with great attention, the obligations of the parties in the present litigation, in which we have had the assistance of the judge of the Commercial Court of New Orleans, in the able and lucid opinion he had prepared on the first hearing of the cause.

We can come to no other conclusion than that, the acceptance was to be the consideration for the consignment, which the holders of the bill had no right to withhold when they exacted the acceptance ; that there is nothing in the evidence which authorized such a proceeding ; that the drawees were not bound to accept the bill, except on delivery of the bill of lading ; and that in refusing to accept as they did, there has been no default on their part; and the bill was, therefore, protested without cause, and the drawer is discharged.

It is vain to attempt to reconcile irreconcileable things, or to determine the obligations of parties to an instrument like this under consideration, by a standard to which it cannot in reason be applied. These bills are entitled to no credit, and ought to receive none, as constituting a part of the commercial currency. They have a consideration coupled with them which strikes at the very root of their availability, and those who take them cannot complain of the hazards to which they think proper to expose their business.

*Judgment affirmed.* [*]

---

[*]*Peirce*, for a rehearing. If this contract is to be construed, not by any particular usage, but by the general law appertaining and applicable to such class of contracts, the drawer of the bill guarantees its *payment*, and should there be any doubt of this construction, it must be against the drawer. Pitman, Principal and Agent, p. 38.

Whether *De Tastet & Co.* were required by their agreement with *Blossman* to accept, is not the question here, as *Lanfear & Co.* were in no manner privy to the correspondence of the parties, but took the bill as a mercantile instrument called a bill of exchange, which is an unconditional order for the payment of a certain sum of money, and passes as a bank note, making part of the currency of merchants. 1 Chitty on Bills, edition of 1834, pp. 28, 30, 33. 3 Taunton, 98. Smith on Bills of Exchange, 126, 128, 159. 3 Campbell, 57. 4 Camp., 214. Byles 67. No verbal understanding, if there had been any, could have altered this character, if made contemporaneously. Such an understanding must appear on the face of the bill at its inception, or it is void. *Vide* authorities *supra.* Byles, 4, 5. 5 T. R. 482.

*Baring, Brothers & Co.* took the bill as an ordinary bill of exchange. If they acted wrongly with the collateral security, an action will lie against them in favor of the parties injured for damages ; and though *De Tastet & Co.* might have refused acceptance, the fact cannot alter *Blossman's* liability to *Lanfear & Co.*, which was entire and unconditional.

Had *Baring, Brothers & Co.* given *Blossman* the bill of exchange, and it was true that the bill of lading was given as security for acceptance alone, and had been improperly refused to be given up, this would be no defence, because there would be but a *partial* failure of consideration, as the property was ready to be delivered on the payment of the bill. Smith, 156. 1 Camp. 40. 2 Ibid, 346. 2 B. and Ad. 155. Byles 38.

There is no doubt that the bill, as between *Blossman* and *De Tastet & Co.*, was drawn on

---

the cotton, which had been purchased by *Blossman* as *De Tastet & Co.'s* agent, as alleged by him in his answer; but he did not buy the cotton of *Lanfear & Co.,* nor pay even with their money, for the bills of lading were delivered to *Lanfear & Co.* before they bought *Blossman's* bill. They were not, therefore, privy to any transaction of *Blossman* with the owner of the cotton, and when shipped by *Blossman,* as the agent of *De Tastet & Co.,* it was so much in *De Tastet & Co.'s* possession that *Blossman* himself had no right of stoppage *in transitu,* and could not transfer any, as, by his own statement, he was not selling to *De Tastet & Co.,* but had bought and paid as their agent. His possession was *De Tastet & Co.'s* possession, and no such defence could be allowed on the bill, as is stated in 2 B. and Ad., 380.

The case of *Mason* v. *Hunt,* Douglas 299, is certainly good law: "If one man, to give credit to another, makes an absolute promise to accept his bill, the drawer, or any other person, may show such promise on the exchange to get credit, and a third person who should advance his money upon it would have nothing to do with the equitable circumstances which might subsist between the drawer and acceptor; but an agreement to accept is still but an agreement, and if it is conditional, and a third person take the bill knowing of the conditions annexed to the agreement, he takes it subject to such conditions." But here there was no agreement shown with conditions. In fact, no agreement was specified at all, and *Lanfear & Co.* were left with the absolute promise of *Blossman*—the consequence of drawing the bill, that *De Tastet & Co.* would accept and pay it, or, in case of their default, that he would pay. *Lanfear & Co.* took the collateral security as security for this engagement of *Blossman,* and it seems to be begging the very question to say, that the condition was known to *Lanfear & Co.* that *Blossman* has to be released, if any party thereafter owning the bill should fail to give up this security on the mere acceptance. This cannot be *presumed* to have been the intention of the parties, as it would make *Lanfear & Co.'s* condition worse than if they had taken no security. By such a construction their absolute bill of exchange would lose its mercantile character, and be changed into a special agreement.

*Rehearing refused.*