NATIONAL BANK OF COMMERCE OF BOSTON *v.* MERCHANTS'
NATIONAL BANK OF MEMPHIS.

1. A bill of lading of merchandise, deliverable to order, when attached to and
   forwarded with a time draft, sent without special instructions to an agent
   for collection, may be surrendered to the drawee on his acceptance of the
   draft. It is not the agent's duty to hold the bill after such acceptance.
2. The holder of a bill of lading, who has become such by indorsement and by
   discounting the draft drawn against the consigned property, succeeds to
   the rights of the shipper. He has the same right to demand acceptance of
   the accompanying draft, and no more; and, if the shipper cannot require
   such acceptance without surrendering the bill of lading, neither can the
   holder.

ERROR to the Circuit Court of the United States for the
District of Massachusetts.

This was a suit brought by the Merchants' National Bank of
Memphis against the National Bank of Commerce of Boston
for alleged negligence in surrendering three bills of lading
attached to three drafts, — two at thirty days, and one on
sight, — which were sent by the Metropolitan National Bank of
New York to the defendant, who surrendered the bills of lading
to the drawees upon their acceptance of the drafts. These were
drawn against the cotton mentioned in the bills of lading. The
defendant had no information that the drafts had been dis-
counted by the Bank of Memphis, and no instructions either
to surrender the bills upon acceptance, or to hold them until
payment of the drafts. The defendant had received through
the same bank in New York drafts to a large amount on the
same parties, accompanied by bills of lading, which they had
always surrendered on acceptance, except in one instance, when
special instructions were given to hold the latter until the
accompanying draft was paid.

A verdict was rendered for the plaintiff.

Several questions were raised in the court below; but it is
not deemed material to mention any thing more than two
portions of the charge of the court, which were as follows: —

"In the absence of any consent of the owner of the bill of
exchange, other than such as may be implied from the mere fact of
sending for collection a bill of exchange, the bank so receiving the
two papers for collection would not be authorized to separate the

bill of lading from the bill of exchange, and surrender it before the bill of exchange was paid."

" If the Metropolitan Bank merely sent to the defendant bank the bill of exchange with the bills of lading attached 'for collection,' with no other instructions, either express or implied from the past relations of the parties, they would not be justified in surrendering on acceptance only."

To both of these instructions the defendant excepted.

*Messrs. H. W. Paine* and *H. C. Hutchins* for plaintiff in error.

In the absence of instructions, the plaintiff in error was authorized to infer that the bills of lading were annexed to the drafts to secure their acceptance, and were to be surrendered on acceptance. *Lanfear* v. *Blossom*, 1 La. Ann. 148; *Coventry* v. *Gladstone*, L. R. 4 Eq. 493; *Gurney* v. *Behrend*, 3 Ell. & Bl. 622; *Shepherd* v. *Harrison et al.*, L. R. 4 Q. B. 196; *Schuchardt et al.* v. *Hall et al.*, 36 Md. 590; *Bryan* v. *Nix*, 4 M. & W. 775; *Marine Bank of Chicago* v. *Wright et al.*, 48 N. Y. 1; *Shepherd* v. *Harrison et al.*, L. R. H. of L. 5, 116; *Wisconsin Bank* v. *Bank of British N. A.*, 21 Upper Canada Queen's Bench, 284; *Clark* v. *Bank of Montreal*, 13 Grant's Ch. (Upper Canada) 211.

*Mr. W. G. Russell, contra.*

The later authorities in England and this country hold, that the holder of a draft, discounted *bona fide* for value, with the bill of lading attached, holds it as security for payment, and not for acceptance merely. *Gilbert* v. *Guignon*, L. R. 8 Ch. 16 (1872); *Seymour* v. *Newton*, 105 Mass. 272; *Newcomb* v. *Boston & Lowell R.R.*, 115 Mass. 230; *Stollenwerck et al.* v. *Thacher et al.*, 115 Mass. 224. The bank which holds the bill of exchange and the bill of lading attached " for collection " holds them in trust for both parties, and is under obligation not to detach one from the other.

MR. JUSTICE STRONG delivered the opinion of the court.

The fundamental question in this case is, whether a bill of lading of merchandise deliverable to order, when attached to a time draft and forwarded with the draft to an agent for collection, without any special instructions, may be sur-

rendered to the drawee on his acceptance of the draft, or whether the agent's duty is to hold the bill of lading after the acceptance for the payment. It is true, there are other questions growing out of portions of the evidence, as well as one of the findings of the jury; but they are questions of secondary importance. The bills of exchange were drawn by cotton-brokers residing in Memphis, Tenn., on Green & Travis, merchants, residing in Boston. They were drawn on account of cotton shipped by the brokers to Boston, invoices of which were sent to Green & Travis; and bills of lading were taken by the shippers, marked in case of two of the shipments "To order," and in case of the third shipment marked "For Green & Travis, Boston, Mass." There was an agreement between the shippers and the drawees that the bill of lading should be surrendered on acceptance of the bills of exchange; but the existence of this agreement was not known by the Bank of Memphis when that bank discounted the drafts, and took with them the bills of lading indorsed by the shippers. We do not propose to inquire now whether the agreement, under these circumstances, ought to have any effect upon the decision of the case. Conceding that bills of lading are negotiable, and that their indorsement and delivery pass the title of the shippers to the property specified in them, and therefore that the plaintiffs, when they discounted the drafts and took the indorsed railroad receipts or bills of lading, became the owners of the cotton, it is still true that they sent the bills with the drafts to their correspondents in New York, the Metropolitan Bank, with no instructions to hold them after acceptance; and the Metropolitan Bank transmitted them to the defendants in Boston, with no other instruction than that the bills were sent "for collection." What, then, was the duty of the defendants? Obviously, it was first to obtain the acceptance of the bills of exchange. But Green & Travis were not bound to accept, even though they had ordered the cotton, unless the bills of lading were delivered to them contemporaneously with their acceptance. Their agreement with their vendors, the shippers, secured them against such an obligation. Moreover, independent of this agreement, the drafts upon their face showed that they had been drawn upon the cotton covered by the bills of

lading.   Both the plaintiffs, and their agents the defendants, were thus informed that the bills were not drawn upon any funds of the drawers in the hands of Green & Travis, and that they were expected to be paid out of the proceeds of the cotton. But how could they be paid out of the proceeds of the cotton if the bills of lading were withheld?  Withholding them, therefore, would defeat alike the expectation and the intent of the drawers of the bills.   Hence, were there nothing more, it would seem that a drawer's agent to collect a time bill, without further instructions, would not be justified in refusing to surrender the property against which the bill was drawn, after its acceptance, and thus disable the acceptor from making payment out of the property designated for that purpose.

But it seems to be a natural inference, indeed a necessary implication, from a time draft accompanied by a bill of lading indorsed in blank, that the merchandise (which in this case was cotton) specified in the bill was sold on credit, to be paid for by the accepted draft, or that the draft is a demand for an advance on the shipment, or that the transaction is a consignment to be sold by the drawee on account of the shipper.   It is difficult to conceive of any other meaning the instruments can have.   If so, in the absence of any express arrangement to the contrary, the acceptor, if a purchaser, is clearly entitled to the possession of the goods on his accepting the bill, and thus giving the vendor a completed contract for payment.   This would not be doubted, if, instead of an acceptance, he had given a promissory note for the goods, payable at the expiration of the stipulated credit.   In such a case, it is clear that the vendor could not retain possession of the subject of the sale after receiving the note for the price.   The idea of a sale on credit is that the vendee is to have the thing sold on his assumption to pay, and before actual payment.   The consideration of the sale is the note.   But an acceptor of a bill of exchange stands in the same position as the maker of a promissory note.   If he has purchased on credit, and is denied possession until he shall make payment, the transaction ceases to be what it was intended, and is converted into a cash sale.   Everybody understands that a sale on credit entitles the purchaser to immediate possession of the property sold, unless there be a special agreement that it may be retained

by the vendor; and such is the well-recognized doctrine of the law. The reason for this is, that very often, and with merchants generally, the thing purchased is needed to provide means for the deferred payment of the price. Hence it is justly inferred that the thing is intended to pass at once within the control of the purchaser. It is admitted that a different arrangement may be stipulated for. Even in a credit sale, it may be agreed by the parties that the vendor shall retain the subject until the expiration of the credit, as a security for the payment of the sum stipulated. But, if so, the agreement is special, something superadded to an ordinary contract of sale on credit, the existence of which is not to be presumed. Therefore, in a case where the drawing of a time draft against a consignment raises the implication that the goods consigned have been sold on credit, the agent to whom the draft to be accepted and the bill of lading to be delivered have been intrusted cannot reasonably be required to know, without instruction, that the transaction is not what it purports to be. He has no right to assume and act on the assumption that the vendee's term of credit must expire before he can have the goods, and that he is bound to accept the draft, thus making himself absolutely responsible for the sum named therein, and relying upon the vendor's engagement to deliver at a future time. This would be treating a sale on credit as a mere executory contract to sell at a subsequent date.

If the inference to be drawn from a time draft accompanied by a bill of lading is, not that it evidences a credit sale, but a request for advances on the credit of the consignment, the consequence is the same. Perhaps it is even more apparent. It plainly is, that the acceptance is not asked on the credit of the drawer of the draft, but on the faith of the consignment. The drawee is not asked to accept on the mere assurance that the drawer will, at a future day, deliver the goods to reimburse the advances: he is asked to accept in reliance on a security in hand. To refuse to him that security is to deny him the basis of his requested acceptance: it is remitting him to the personal credit of the drawer alone. An agent for collection having the draft and attached bill of lading cannot be permitted, by declining to surrender the bill of lading on the accept-

ance of the bill, to disappoint the obvious intentions of the parties, and deny to the acceptor a substantial right which by his contract is assured to him. The same remarks are applicable to the case of an implication that the merchandise was shipped to be sold on account of the shipper.

Nor can it make any difference that the draft with the bill of lading has been sent to an agent (as in this case) "for collection." That instruction means simply to rebut the inference from the indorsement that the agent is the owner of the draft. It indicates an agency. *Sweeny* v. *Easter,* 1 Wall. 166. It does not conflict with the plain inference from the draft and accompanying bill of lading that the former was a request for a promise to pay at a future time for goods sold on credit, or a request to make advances on the faith of the described consignment, or a request to sell on account of the shipper. By such a transmission to the agent, he is instructed to collect the money mentioned in the drafts, not to collect the bill of lading; and the first step in the collection is procuring acceptance of the draft. The agent is, therefore, authorized to do all which is necessary to obtaining such acceptance. If the drawee is not bound to accept without the surrender to him of the consigned property or of the bill of lading, it is the duty of the agent to make that surrender; and if he fails to perform this duty, and in consequence thereof acceptance be refused, the drawer and indorsers of the draft are discharged. *Mason* v. *Hunt,* 1 Doug. 297.

The opinions we have suggested are supported by other very rational considerations. In the absence of special agreement, what is the consideration for acceptance of a time draft drawn against merchandise consigned? Is it the merchandise? or is it the promise of the consignor to deliver? If the latter, the consignor may be wholly irresponsible. If the bill of lading be to his order, he may, after acceptance of the draft, indorse it to a stranger, and thus wholly withdraw the goods from any possibility of their ever coming to the hands of the acceptor. Is, then, the acceptance a mere purchase of the promise of the drawer? If so, why are the goods forwarded before the time designated for payment? They are as much, after shipment, under the control of the drawer, as they were before. Why

incur the expense of storage and of insurance? And if the draft with the goods or with the bill of lading be sent to a bank for collection, as in the case before us, can it be incumbent upon the bank to take and maintain custody of the property sent during the interval between the acceptance and the time fixed for payment? (The shipments in this case were hundreds of bales of cotton.) Meanwhile, though it be a twelvemonth, and no matter what the fluctuations in the market value of the goods may be, are the goods to be withheld from sale or use? Is the drawee to run the risk of falling prices, with no ability to sell till the draft is due? If the consignment be of perishable articles, — such as peaches, fish, butter, eggs, &c., — are they to remain in a warehouse until the term of credit shall expire? And who is to pay the warehouse charges? Certainly not the drawees. If they are to be paid by the vendor, or one who has succeeded to the place of the vendor by indorsement of the draft and bill of lading, he fails to obtain the price for which the goods were sold.

That the holder of a bill of lading, who has become such by indorsement and by discounting the draft drawn against the consigned property, succeeds to the situation of the shipper, is not to be doubted. He has the same right to demand acceptance of the accompanying bill, and no more. If the shipper cannot require acceptance of the draft without surrendering the bill of lading, neither can the holder. Bills of lading, though transferable by indorsement, are only *quasi* negotiable. 1 Parsons on Shipping, 192; *Blanchard* v. *Page*, 8 Gray, 297 *a*. The indorser does not acquire a right to change the agreement between the shipper and his vendee. He cannot impose obligations or deny advantages to the drawee of the bill of exchange drawn against the shipment which were not in the power of the drawer and consignor. But, were this not so in the case we have now in hand, the agents for collection of the drafts were not informed, either by the drafts themselves or by any instructions they received, or in any other way, that the ownership of the drafts and bills of lading was not still in the consignors of the cotton. On the contrary, as the drafts were sent " for collection," they might well conclude that the collection was to be made for the drawers of the bills. We do

not, therefore, perceive any force in the argument pressed upon us, that the Bank of Memphis was the purchaser of the drafts drawn upon Green & Travis, and the holder of the bills of lading by indorsement of the shippers.

It is urged that the bills of lading were contracts collateral to the bills of exchange which the bank discounted, and that, when transferred, they became a security for the principal obligation; namely, the contract evidenced by the bills of exchange, — for the *whole* contract, and not a part of it; and that the whole contract required not only the acceptance, but the payment of the bills. The argument assumes the very thing to be proved; to wit, that the transfer of the bills of lading were made to secure the payment of the drafts. The opposite of this, as we have seen, is to be inferred from the bills of lading and the time drafts drawn against the consignments, unexplained by express stipulations. The bank, when discounting the drafts, was bound to know that the drawers on their acceptance were entitled to the cotton, and, of course, to the evidences of title to it. If so, they knew that the bills of lading could not be a security for the ultimate payment of the drafts. Payment of the drafts by the drawees was no part of the contract when the discounts were made. The bills of exchange were then incomplete. They needed acceptance. They were discounted in the expectation that they would be accepted, and that thus the bank would obtain additional promisors. The whole purpose of the transfers of the bills of lading to the bank may, therefore, well have been satisfied when the additional names were secured by acceptance, and when the drafts thereby became completed bills of exchange. We have already seen, that whether the drafts and accompanying bills of lading evidenced sales on credit, or requests for advancements on the cotton consigned, or bailments to be sold on the consignor's account, the drawees were entitled to the possession of the cotton before they could be required to accept; and that, if they had declined to accept because possession was denied to them concurrently with their acceptance, the effect would have been to discharge the drawers and indorsers of the drafts. The demand of acceptance, coupled with a claim to retain the bills of lading, would have been an insufficient de-

mand. Surely the purpose of putting the bills of lading into the hands of the bank was to secure the completion of the drafts by obtaining additional names upon them, and not to discharge the drawers and indorsers, leaving the bank only a resort to the cotton pledged.

It is said, that, if the plaintiffs were not entitled to retain the bills of lading as a security for the payment of the drafts after their acceptance, their only security for payment was the undertaking of the drawees, who were without means, and the promise of the acceptors, of whose standing and credit they knew nothing. This may be true; though they did know that the acceptors had previously promptly met their acceptances, which were numerous, and large in amount. But, if they did not choose to rely solely on the responsibility of the acceptors and drawers, they had it in their power to instruct their agents not to deliver the cotton until the drafts were paid. Such instructions are not infrequently given in case of time drafts against consignments; and the fact that they are given tends to show that in the commercial community it is understood, that, without them, agents for collection would be obliged to give over the bills of lading on acceptance of the draft. Such instructions would be wholly unnecessary, if it is the duty of such agents to hold the bills of lading as securities for the ultimate payment.

Thus far, we have considered the question without reference to any other authority than that of reason. In addition to this, we think the decisions of the courts and the language of many eminent judges accord with the opinions we avow. In the case of *Lanfear* v. *Blossom*, 1 La. Ann. 148, the very point was decided, after an elaborate argument both by the counsel and by the court. It was held that "where a bill of exchange drawn on a shipment, and payable a certain number of days after sight, is sold, with the bill of lading appended to it, the holder of the bill of exchange cannot, in the absence of proof of any local usage to the contrary, or of the imminent insolvency of the drawee, require the latter to accept the bill of exchange, except on the delivery of the bill of lading; and when, in consequence of the refusal of the holder to deliver the bill of lading, acceptance is refused, and the bill protested,

the protest will be considered as made without cause, the drawee not having been in default, and the drawer will be discharged." This decision is not to be distinguished in its essential features from the opinions we have expressed. A judgment in the same case to the same effect was given in the Commercial Court of New Orleans by Judge Watts, who supported it by a very convincing opinion. 14 Hunt's Merchants' Magazine, 264. These decisions were made in 1845 and 1846. In other courts, also, the question has arisen, What is the duty of a collecting bank to which time drafts, with bills of lading attached, have been sent for collection? and the decisions have been, that the agent is bound to deliver the bills of lading to the acceptor on his acceptance. In the case *The Wisconsin Marine & Fire Insurance Company* v. *The Bank of British North America*, 21 Upper Canada Queen's Bench, 284, decided in 1861, where it appeared that the plaintiff, a bank at Milwaukee, Wis., had sent to the defendants, a bank at Toronto, for collection, a bill drawn by A. at Milwaukee on B. at Toronto, payable forty-five days after date, together with a bill of lading, indorsed by A., for certain wheat sent from Milwaukee to Toronto, it was held, that, in the absence of any instructions to the contrary, the defendants were not bound to retain the bill of lading until payment of the draft by B., but were right in giving it up to him on obtaining his acceptance. This case was reviewed in 1863 in the Court of Error and Appeals, and the judgment affirmed. 2 Upper Canada Error and Appeal Reps. 282. See also *Goodenough* v. *The City Bank*, 10 Upper Canada Com. Pleas, 51; *Clark* v. *The Bank of Montreal*, 13 Grant's Ch. 211.

There are also many expressions of opinion by the most respectable courts, which, though not judgments, and therefore not authorities, are of weight in determining what are the implications of such a state of facts as this case exhibits. In *Shepherd* v. *Harrison et al.*, L. R. Q. B., vol. iv., p. 493, Lord Cockburn said, "The authorities are equally good to show, when the consignor sends the bill of lading to an agent in this country to be by him handed over to the consignee, and accompanies that with bills of exchange to be accepted by the consignee," that that "indicates an intention *that the handing over*

*of the bill of lading, and the acceptance of the bill or bills of exchange, should be concurrent parts of one and the same trans-action."* The case subsequently went to the House of Lords, 5 H. L. 133; when Lord Cairns said, "If they (the drawees) accept the cargo and bill of lading, and accept the bill of exchange drawn against the cargo, the object of those who shipped the goods is obtained. They have got the bill of exchange in return for the cargo; they discount, or use it as they think proper; and they are virtually paid for the goods." In *Coventry* v. *Gladstone*, 4 L. R. Eq. 493, it was declared by the Vice-Chancellor that "the parties shipping the goods from Calcutta, in the absence of any stipulation to the contrary, did give their agents in England full authority, if they thought fit, to pass over the bill of lading to the person who had accepted the bill of exchange" drawn against the goods, and attached to the bill of lading; and it was ruled that an alleged custom of trade to retain the bill of lading until payment of the accompanying draft on account of the consignee was exceptional, and was not established as being the usual course of business. In *Schuchardt et al.* v. *Hall et al.*, 39 Md. 590, which was a case of a time draft, accompanied by a bill of lading, hypothecated by the drawer, both for the acceptance and payment of the draft, and when the drawers had been authorized to draw against the cargo shipped, it was said by the court, "Under their contract with the defendants, the latter were authorized to draw only against the cargo of wheat to be shipped by the 'Ocean Belle;' and they (the drawees) were, therefore, not bound to accept without the delivery to them of the bill of lading." See also the language of the judges in *Gurney* v. *Behrend*, 3 Ell. & Bl. 622; *Marine Bank* v. *Wright*, 48 N. Y. 1; *Cayuga Bank* v. *Daniels*, 47 id. 631.

We have been unable to discover a single decision of any court holding the opposite doctrines. Those to which we have been referred as directly in point determine nothing of the kind. *Gilbert* v. *Guignon*, L. R. 8 Ch. 16, was a contest between two holders of several bills of lading of the same shipment. The question was, Which had priority? It was not all whether the drawee of a time draft against a consignment has not a right to the bill of lading when he accepts. The drawer

had accepted without requiring the surrender of the first indorsed bill of lading; and the Lord Chancellor, while suggesting a query whether he might not have declined to accept unless the bills of lading were at the same time delivered up to him, remarked, " If he was content they should remain in the hands of the holder, it was exactly the same thing as if he had previously and originally authorized that course of proceeding; and · that (according to the Chancellor's view) was actually what had happened in the case." Nothing, therefore, was decided respecting the rights of the holder of a time draft, to which a bill of lading is attached, as against the drawee. The contest was wholly *inter alios.*

*Seymour* v. *Newton,* 105 Mass. 272, was the case of an acceptance of the draft, without the presentation of the bill of lading. In that respect, it was like *Gilbert* v. *Guignon.* No question, however, was made in regard to this. The acceptor became insolvent before the arrival of the goods; and all that was decided was, that, under the circumstances, the jury would be authorized to find that the lien of the shippers had not been discharged. It was a case of stoppage *in transitu.* It is true, that, in delivering the opinion of the court, Chief Justice Chapman said, " The obvious purpose was, that there should be no delivery to the vendee till the draft should be paid." But the remark was purely *obiter,* uncalled for by any thing in the case. *Newcomb* v. *The Boston & Lowell Railroad Corporation,* 115 Mass. 230, was also the case of acceptance of sight drafts, without requiring the delivery of the attached bills of lading : and the contest was not between the holder of the drafts and the acceptor; it was between the holder of the drafts with the bills of lading and the carrier. We do not perceive that the case has any applicability to the question we have now under consideration. True, there, as in the case of *Seymour* v. *Newton,* it was remarked by the judge who delivered the opinion, " The railroad receipts were manifestly intended to be held by the collecting bank as security for the acceptance and payment of the drafts." Intended · by whom? Evidently the court meant by the drawees and the bank; for it is immediately added, " They continued to be held by the bank after the drafts had been accepted by Chandler & Co. (the drawees), and until at

Chandler & Co.'s request they were paid by the plaintiff; and the receipts with the drafts still attached were indorsed and delivered by Chandler & Co. to the plaintiff." In *Stollenwerck et al.* v. *Thacher et al.*, 115 Mass. 224 (the only other case cited by the defendants in error as in point on this question), there were instructions to the agent to deliver the bill of lading only on payment of the draft; and it was held that the special agent, thus instructed, could not bind his principal by a delivery of the bill without such payment. Nothing was decided that is pertinent to the present case. In *Bank* v. *Bayley*, reported in the same volume, p. 228, where the instructions given to the collecting agent were, so far as it appears, only that the drafts and bills of lading were remitted for collection, and where acceptance was refused, Chief Justice Gray said, "The drawees of the draft attached to each of the bills of lading were not entitled to the bill of lading, or the property described therein, except upon *acceptance* of the draft." It is but just to say, however, that this remark, as well as those made by the same judge in the other Massachusetts cases cited, was aside from the decision of the court.

After this review of the authorities cited, as in point, in the very elaborate argument for the defendants in error, we feel justified in saying, that, in our opinion, no respectable case can be found in which it has been decided that when a time draft has been drawn against a consignment to order, and has been forwarded to an agent for collection with the bill of lading attached, without any further instructions, the agent is not justified in delivering over the bill of lading on the acceptance of the draft.

If this, however, were doubtful, the doubt ought to be resolved favorably to the agent. In the case in hand, the Bank of Commerce, having accepted the agency to collect, was bound only to reasonable care and diligence in the discharge of its assumed duties. *Warren* v. *The Suffolk Bank*, 10 Cush. 582. In a case of doubt, its best judgment was all the principal had a right to require. If the absence of specific instructions left it uncertain what was to be done further than to procure acceptances of the drafts, and to receive payment when they fell due, it was the fault of the principal. If the consequence was a loss, it would be most unjust to cast the loss on the agent.

Applying what we have said to the instruction given by the learned judge of the Circuit Court to the jury, it is evident that he was in error. Without discussing in detail the several assignments of error, it is sufficient for the necessities of this case to say that it was a mistake to charge the jury, as they were charged, that "in the absence of any consent of the owner of a bill of exchange, other than such as may be implied from the mere fact of sending 'for collect n' a bill of exchange with a bill of lading pasted or attache to a bill of exchange, the bank so receiving the two papers for collection would not be authorized to separate the bill of lading from the bill of exchange, and surrender it before the bill of exchange was paid." And again: there was error in the following portion of the charge: "But if the Metropolitan Bank merely sent to the defendant bank the bills of exchange with the bills of lading attached for collection, with no other instructions, either expressed or implied from the past relations of the parties, they would not be so justified in surrendering (the bills of lading) on acceptance only." The Bank of Commerce can be held liable to the owners of the drafts for a breach of duty in surrendering the bills of lading on acceptance of the drafts, only after special instructions to retain the bills until payment of the acceptances. The drafts were all time drafts. One, it is true, was drawn at sight; but, in Massachusetts, such drafts are entitled to grace.

What we have said renders it unnecessary to notice the other assignments of error.

*The judgment of the Circuit Court is reversed, and the record is remitted with directions to award a new trial.*