## LE MORE et al. v. UNITED STATES.

(Circuit Court of Appeals, Fifth Circuit.     July 29, 1918.     Rehearing Denied November 9, 1918.)

### No. 3188.

1. CRIMINAL LAW &—619—CONSOLIDATION OF INDICTMENTS—DISCRETION.

   The trial court may, in its discretion, consolidate several indictments before trial, and try the same together.

2. POST OFFICE &—49—SCHEME TO DEFRAUD—EVIDENCE.

   In a prosecution under Pen. Code, § 215 (Comp. St. 1916, § 10385), for use of the mails in connection with a scheme to defraud, whereby defendants induced ocean carriers to issue bills of lading though no shipments were delivered, and drafts with bills of lading attached were negotiated. though persons on whom drafts were drawn accepted them knowing all circumstances, held, that evidence was sufficient to go to jury.

3. POST OFFICE &—35—OFFENSES—SCHEME TO DEFRAUD.

   To sustain a conviction under Pen. Code, § 215 (Comp. St. 1916, § 10385). denouncing use of mails in connection with a scheme to defraud, proof only of the devising of the scheme or artifice to defraud, without proof that any one was defrauded, is sufficient.

4. CRIMINAL LAW &—822(1)—INSTRUCTIONS AS A WHOLE.

   An extract is not to be considered apart from the charge, and error cannot be predicated thereon where the charge as a whole is correct.

5. CRIMINAL LAW &—829(1)—REFUSAL OF REQUESTS.

   The refusal of requests to charge, covered substantially by the charge given, is not error.

6. CRIMINAL LAW &—829(8)—INSTRUCTIONS—GOOD CHARACTER.

   Where the court correctly and fully charged on good character, the refusal of a requested charge that good character itself might generate a reasonable doubt of guilt held proper.

7. CRIMINAL LAW &—393(2)—EVIDENCE COMPULSORILY PRODUCED.

   In a prosecution under Pen. Code, § 215 (Comp. St. 1916, § 10385), for using the mails in connection with scheme to defraud, books of ac-

---

count of partnerships in which defendants were partners, which were produced by the trustee in bankruptcy of the firms, who had taken possession of them, held admissible over objections that they were compulsorily produced.

8. POST OFFICE ⬅️49—OFFENSES—EVIDENCE.

In a prosecution under Pen. Code, § 215 (Comp. St. 1916, § 10385), for using the mails in connection with a scheme to defraud, where defendants contended that money obtained, etc., went into firms of which they were members, *held* that the government could show the amounts defendants drew from such firms, etc.

9. CRIMINAL LAW ⬅️351(10)—ATTEMPT TO DESTROY EVIDENCE.

In a prosecution under Pen. Code, § 215 (Comp. St. 1916, § 10385), for using the mails in connection with a scheme to defraud, whereby ocean carriers were induced to issue bills of lading though no shipments were delivered, etc., a cablegram sent by one of the defendants directing destruction of bills of lading, etc., *held* admissible against him, being an attempt to destroy evidence.

10. CRIMINAL LAW ⬅️371(1)—EVIDENCE—OTHER OFFENSES—INTENT.

In a prosecution under Pen. Code, § 215 (Comp. St. 1916, § 10385), for using the mails in connection with a scheme to defraud, whereby ocean carriers were induced to issue bills of lading though no shipments were delivered, etc., proof of the use of other bills of lading, to cover which no goods were shipped, was admissible on the issue of fraudulent intent, the evidence not being confined to transactions set out in the indictment.

11. CRIMINAL LAW ⬅️448(12)—OPINION—EVIDENCE.

In a prosecution under Pen. Code, § 215 (Comp. St. 1916, § 10385), for using mails in connection with a scheme to defraud, whereby defendants induced ocean carriers to issue bills of lading though no shipments were delivered, and drafts with the bills of lading attached were negotiated, etc., testimony by bankers that they would not have made advances had bills not been attached, or had they known no goods were shipped, was admissible, being evidence of effect of recitals according to course of business of bankers, rather than mere opinion as to effect in a specific instance.

12. CRIMINAL LAW ⬅️448(3)—EVIDENCE—INTENT.

In a prosecution under Pen. Code, § 215 (Comp. St. 1916, § 10385), for using the mails in connection with a scheme to defraud, whereby defendants induced ocean carriers to issue bills of lading though no shipments were delivered, and drafts with bills attached were negotiated, etc., testimony that witness did not personally expect to make shipments when he drew bills was not incompetent, as a statement of opinion, where answer was limited to his own expectation, and amounted to no more than that witness gave no instructions for shipment when he drew the bills.

13. POST OFFICE ⬅️49—OFFENSES—EVIDENCE.

In a prosecution under Pen. Code, § 215 (Comp. St. 1916, § 10385), for using the mails in connection with a scheme to defraud, whereby defendants induced ocean carriers to issue bills of lading though no shipments were delivered, and drafts with the bills of lading attached were negotiated, etc., *held,* that testimony that witness drawing bills of lading declined to accept power on ground bills of lading were not regular was admissible on question of defendant's intent.

14. WITNESSES ⬅️277(4)—CROSS-EXAMINATION OF ACCUSED—SCOPE.

Where a defendant charged with violating Pen. Code, § 215 (Comp. St. 1916, § 10385), by using mails in connection with scheme to defraud, whereby ocean carriers were induced to issue fraudulent bills of lading, which were attached to drafts that were negotiated, testified that acceptors who understood transaction were able to pay, etc., cross-examination as to amount of acceptances was not objectionable as relating to matter not brought out on direct examination.

⬅️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

15. WITNESSES ⊙⇒277(1)—CROSS-EXAMINATION OF ACCUSED—DISCRETION.

Where a defendant voluntarily takes the stand he waives his constitutional privilege, and the extent of his cross-examination is a matter for the discretion of the trial judge.

16. CRIMINAL LAW ⊙⇒721(2)—ARGUMENT—DEFENDANT'S FAILURE TO TESTIFY.

Where defendant took the stand, but was prevented from answering questions on cross-examination by objections that they did not come within the scope of the direct examination, the prosecutor could comment in his argument on defendant's failure to answer.

17. CRIMINAL LAW ⊙⇒722½—ARGUMENT—OTHER OFFENSES.

In a prosecution under Pen. Code, § 215 (Comp. St. 1916, § 10385), for using the mails in connection with a scheme to defraud, etc., where defendants, who had become bankrupt, contended that moneys realized from the scheme went into their business, argument of the prosecutor as to disposition of the proceeds, held warranted, not being in effect an attempt to charge defendants with the offense of concealment in bankruptcy.

18. CRIMINAL LAW ⊙⇒1134(4)—MOTION FOR NEW TRIAL—REVIEW.

The overruling of defendant's motion for new trial cannot be reviewed on writ of error.

In Error to the District Court of the United States for the Eastern District of Louisiana; Rufus E. Foster, Judge.

Albert Le More and Edward E. Carriere were convicted of having devised a scheme or artifice to defraud, etc., in violation of Penal Code, § 215, and they bring error. Affirmed.

Charlton R. Beattie, of New Orleans, La., George Wesley Smith, of Rayville, La., and Michel Provosty, of New Orleans, La., for plaintiffs in error.

Jos. W. Montgomery, U. S. Atty., of New Orleans, La.

Before WALKER and BATTS, Circuit Judges, and GRUBB, District Judge.

GRUBB, District Judge. [1] 1. The plaintiffs in error were convicted of having devised a scheme or artifice to defraud in violation of section 215 of the Penal Code (Act March 4, 1909, c. 321, 35 Stat. 1130 [Comp. St. 1916, § 10385]). They were convicted under two indictments, which were consolidated before trial, and tried together. Plaintiffs in error objected to the consolidation, and assign the order of the court directing the consolidation as error; but this was a discretionary matter, and no abuse of discretion is shown in the record.

[2, 3] 2. The plaintiffs in error also assign as error the refusal of the District Court to direct a verdict of acquittal. Section 215 requires of the government, in order to prove its case, to establish but two things: The forming or devising a scheme to defraud, and the deposit in the post office of a letter to effectuate the scheme. Among other classes of frauds mentioned in the section is devising of a scheme to defraud by means of false representations, and this is the class of fraud relied upon by the government in this case for conviction. No questions presented by the appeal relate to the second proposition, i. e., the use of the mails by the plaintiffs in error. It is denied by them that they devised any scheme to defraud the parties they are alleged in

⊙⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the indictments to have intended to defraud. The scheme relied upon by the government was, briefly stated, this: The plaintiffs in error were engaged in the business of exporting staves from the ports of Mobile and New Orleans to European countries, and had been so engaged for many years before their bankruptcy. The staves were exported by them to three or four regular consignees, among whom was the firm of B. Gairard Fils, in Paris. They had also formed a branch in England, which did business under the name of the Liverpool Stave Company, and to which they consigned staves. When they shipped staves the course of business was to draw on the consignee, with bill of lading for the staves attached to the draft, and to procure bankers in this country or abroad to purchase or discount the drafts. The drafts were time drafts, which required acceptance by the consignee on presentation. Payment followed in 60 or 90 days after acceptance. The bills of exchange had attached to them a slip, directing delivery of the attached bill of lading to the acceptor, upon his acceptance, and the course of business was to make delivery of the bill of lading to the consignee, upon his acceptance of the draft and bill of exchange, and he thereby acquired title to the staves, if any were shipped. For many years before the bankruptcy of the firms of which the plaintiffs in error were the members a practice had sprung up between these firms and two steamship lines, the Austro-American Steamship Company and the Vogeman Line, to issue bills of lading to the firms of plaintiffs in error for staves when no staves had been in fact received by the steamship company for transportation, upon a letter of the plaintiffs in error guaranteeing future delivery of staves of the quantity and description set out in the bill of lading. Certain of the consignees were privy to this course of business. The evidence tended to show, with reference to the Austro-American Line, at least, that it made an endeavor to locate on the yard of plaintiffs in error in New Orleans, which was opposite the steamship company's dock, staves corresponding to the requirement of each bill of lading, and to identify them. However, the staves were never delivered on shipboard in a large majority of cases during the last years of the firms' history. Instead of shipping the staves to the consignee, in pursuance of the bill of lading, when the draft drawn on the consignee was presented to him for acceptance he accepted the draft, detached the bill of lading, and surrendered it either to the officers of the steamship company at European port of destination or returned it to the plaintiffs in error's firm in this country, and they in turn surrendered it to the steamship company's agents at point of shipment. Upon receipt of the bill of lading the steamship company surrendered the letter of guaranty which they had taken to secure delivery of the staves to the plaintiffs in error or their firm. Upon receiving each bill of lading plaintiffs in error drew against the consignee mentioned in it for the purchase price of the supposed shipment, attached the bill of lading evidencing the shipment to the draft, presented the draft, with bill of lading attached, to some banker for discount, and received the proceeds of the draft from the banker. The banker thereupon forwarded the draft and bill of lading to the consignee, through its correspondents, and procured the acceptance of the

draft by the consignee, and the consignee, upon presentment of the draft for payment, would pay it, though he had never received any staves at all. All the drafts which were the basis of all the counts in both indictments had been presented and accepted in this way, though no shipments of staves had been made to answer the requisition of the bills of lading. In the years during which this practice was pursued drafts amounting to $16,000,000 had pursued this course. Many of these drafts were paid by subsequently drawn drafts, which were, in effect, renewals of the previously drawn drafts. This course of business was in this way prolonged. The drafts against which no shipments of staves were made, and which were not mere renewals, represented unsecured loans to the drawers. At the time of the bankruptcy there were outstanding, accepted but unpaid, drafts in an amount largely in excess of a million dollars, B. Gairard Fils having accepted over a million of this amount. The death of the senior Gairard precipitated the crisis, resulting in the failure of his firm, and as well that of the other consignees, the Liverpool Stave Company, the Association Industrielle Française of Paris, Coulon, Berthoud & Co., and Fry, Miers & Co. of London, and thereafter the partnerships of which plaintiffs in error were members. The holders of the drafts, which were outstanding, accepted, but not paid, were unable to obtain payment either from the bankrupt drawers or drawees, and had no recourse against the bills of lading or their contents.

The positions of the plaintiffs in error are twofold. They say no fraud was committed by them because the evidence shows that they intended that the drafts should be paid by the acceptors, and were reasonably justified in believing that they would be paid from the fact that over a course of previous years similar drafts had been paid in every case, though they had aggregated millions, and because the consignees were wealthy business men, who were supposed to be amply able to respond to liabilities such as were represented by their acceptances. They further say that, conceding a fraud was committed by the false representation contained in the bill of lading attached to the drafts, and to cover which no goods had been delivered to the issuing steamship company for transportation, the persons defrauded were not the bankers who discounted the drafts, as the indictments charged, because the law and the direction contained on the slips attached to the drafts advised them that the bills of lading were security for the acceptance only of the drafts, and not for their payment, and because all the drafts set out in the indictment were in fact accepted, and the bills of lading delivered to acceptors for their disposition, and it was immaterial to the bankers, after acceptance, whether the bills of lading were true or false. They also say that, according to the course of business, the bankers invariably exacted of the consignees either an acceptance on the draft itself, or a cabled agreement to accept, which was its equivalent, before any money was advanced on the faith of them.

As to the first contention, the fraud asserted by the government against the plaintiffs in error was not the drawing of the drafts and obtaining the proceeds of the discount thereof, intending not to pay the drafts, either primarily through the acceptors or secondarily them-

selves. If it had been, an expectation, actually and reasonably entertained by the drawers that the acceptors were able and willing to pay the drafts, might have deprived the transaction of a fraudulent intent to obtain the proceeds of the discount of the drafts, expecting the drafts not to be paid. The fraud relied upon, however, consisted in an alleged false representation contained in the bills of lading, materially affecting the ability of the acceptors to pay the drafts, and inducing the bankers to part with their money, when they might have been unwilling to do so if no such representations had been made. The bill of lading recited the delivery by plaintiffs in error to the issuing steamship company for transportation to the consignee and drawee of staves in value equal to the amount of the draft.

As to the second contention, such representation might constitute a material inducement to the bankers to advance on the drafts in two ways: First, it was an assurance that the drawee would be put in funds from the proceeds of the sale of the staves when received sufficient to take up the drafts, and, second, it gave to the numerous transactions evidenced by the drafts and bills of lading the appearance of regular purchases of merchandise by the drawers, and the means of paying the sellers in a commercially recognized and customary way, when in truth and in fact the transactions were not purchases of staves by the drawees, but mere unsecured loans to the drawers from the drawees, under the disguise of regular dealings between seller and buyer of merchandise.

The function of the bills of lading was not altogether limited to that of security for the acceptance of the draft. Conceding that the bankers were not entitled to look to the bills of lading as security for either the acceptance or payment of the drafts, we still think that the recital might well constitute a material representation (1) that the acceptor would have funds with which to pay the draft when it matured, and (2) that the transaction was one in the regular course of mercantile business, and not an irregular way of borrowing money without security. If the representation was false, in that no staves were intended to be shipped when the bills of lading were issued and presented to the bankers with the drafts, then it was probable that the bankers would be defrauded in either of the ways stated by such false representations. Again, the offense created by section 215 requires proof only of the devising of a scheme or artifice to defraud. It does not require the government to establish that any person was actually defrauded by the scheme. In this it differs from the offense of obtaining money or property by false pretenses. Even though the drafts, the basis of the various counts in the indictment, were in fact accepted before the banks made advances on them, and even though such had been the usual course of business, it would not follow necessarily that the plaintiffs in error knew that acceptances would always precede advances, when they formed or designed the scheme, so as to exclude all idea that the plaintiffs in error anticipated that the bankers might rely upon the security of the bills of lading pending the time they made the advances and the time of acceptance. We think the jury were authorized to infer that the alleged false representations in the bills of lading were of a

character calculated to deceive and defraud the bankers who advanced on the faith of them, and this though the bills of lading were security for the acceptance only, and not for the payment of the drafts.

If the plaintiffs in error devised a scheme to deceive by false representations the takers of the drafts as to a material fact, affecting the ability of the acceptors to pay the drafts, or affecting the value of the security accompanying them, or the regularity of the transaction evidenced by them, and which was calculated to deceive them and induce them to discount the drafts, when otherwise they would not have done so, we think a case would be made out under section 215 of the Criminal Code, though the plaintiffs in error believed, and had reasonable grounds for believing, that the drafts would be accepted and paid by the drawees. The bankers would have been defrauded by a false representation that induced them to believe they were getting something more secure than they actually got, and the forming of a plan to do this by means of false representations would be the devising of a scheme to defraud within the express terms of section 215.

The presentation to a bank for discount of a draft with a bill of lading attached well could be regarded as a request to cash, or make an advance on, the price of goods shipped, and as a representation that the drawee's acceptance would amount to a promise to pay for goods actually shipped and by the delivery of the bill of lading made subject to his order. The absence, without the knowledge of the discounting bank, of a real shipment would make the discounting of the draft the financing of what appeared to be a real movement of goods, but which in reality was a mere deceptive appearance of such a transaction. On the face of it the supposed actual shipment of goods is a basis for a credit or advance so obtained, it appearing that the drawers were parting with the goods called for by the bill of lading, and that the drawee by his acceptance would be promising to pay for goods in transit consigned to him or his order. The result of such operations was that what the drawers and drawees realized from them came from the discounting banks, and not, as it appeared, from staves owned, shipped, and received.

For these reasons we do not think the District Court erred in refusing to direct an acquittal.

[4] 3. The next assignment is based on a portion of the charge of the District Judge. The part complained of is as follows:

"But if the only reason or cause of their discounting of the draft was the reason that they believed that the goods had been shipped, as set out in the bill of lading, that would be a false pretense and a fraudulent scheme, and the mailing of the letters in furtherance of that would complete a federal offense."

Taken by itself, the part complained of may omit reference to some of the elements of the offense, and, by reason of the omission, appear to lay undue emphasis on the influence the representations had on the bankers; but the extract is not to be separated from its context, nor considered apart from the rest of the charge. When considered with the rest of the charge, we see no error in it.

[5] 4. The plaintiffs in error complain of the refusal of the District

Judge to grant certain of their special requests to charge. We think the first, if abstractly correct, has no application to a case of alleged fraud based on false representations as to the shipment of goods contained in a bill of lading. The most visionary could not hope that merchandise not delivered to the carrier would reach the consignee. This was the gist of the scheme to defraud charged in the indictment.

We think requests numbered from 2 to 7, inclusive, were otherwise substantially charged by the court. They relate to the principle that the bills of lading attached to the drafts secured the acceptance and not the payment of the drafts, as was held in the case of National Bank v. Merchants' Bank, 91 U. S. 92, 23 L. Ed. 208.

Requests numbered 8, 9, and 10 predicated the guilt of the plaintiffs in error upon the belief of the jury that they entertained no reasonable expectation that the drafts would be paid when they procured their discount. We do not think they assert the law of this case.

[6] The eleventh request is to the effect that good character, when proven, might of itself generate a reasonable doubt of the guilt of plaintiffs in error. The District Judge charged fully upon the effect of evidence of good character in other respects. The plaintiffs in error rely upon the statement of the court in the opinion in the case of Edgington v. United States, 164 U. S. 361–366, 17 Sup. Ct. 72, 74 (41 L. Ed. 467), that "the circumstances may be such that an established reputation for good character, if it is relevant to the issue, would alone create a reasonable doubt, although without it the other evidence would be convincing." What the court decided in that case was that the value of evidence of good character was not confined to doubtful or conflicting cases, or not to be considered by the jury "unless the other evidence left the mind in doubt," but that the weight of authority was to the effect that good character in any case, when considered in connection with the other evidence in the case, might generate a reasonable doubt. What the court said with reference to reputation for good character under some circumstances alone being sufficient to create a reasonable doubt, though without it the other evidence would be convincing, was said by way of argument, and not to announce a rule of law to be given in charge to the jury. We do not think that the trial judge was required to charge the jury in the language quoted from the opinion.

[7, 8] 5. (a) Exceptions to rulings on the evidence are relied upon for reversal. The District Judge permitted the government to introduce in evidence the books of account of the partnerships in which plaintiffs in error were partners. They were produced by the trustee in bankruptcy of the partnership, who had taken possession of them, as the books of the bankrupt firm. The plaintiffs in error objected to their use by the government upon the ground that they were compulsorily produced. The case of Johnson v. United States, 228 U. S. 457, 33 Sup. Ct. 572, 57 L. Ed. 919, 47 L. R. A. (N. S.) 263, holds to the contrary. Objection was also made to that part of the books which contained the personal accounts of the plaintiffs in error, upon the additional ground that such accounts were immaterial to any issue in the case. The plaintiffs in error contended that the money obtained on the irregular drafts all went into the business of the partnerships with

which they were connected. We think the government had the right to show, by way of explanation, the amounts that were drawn out of the partnerships by the plaintiffs in error, the individual partners.

[9, 10] (b) The plaintiffs in error also complain of the admission in evidence of a cablegram addressed to one Medinger at Paris, and delivered by the plaintiff in error Carriere to the witness Lambert to be coded and transmitted to the addressee. The loss of the original message was proven, and a foundation laid for the introduction of the copy. The cablegram was sent three or four days after the failure of the firms in which the plaintiffs in error were partners, and directed the addressee, their Paris representative, to get some bills of lading issued by the Austro-American Steamship Company which were supposed to be in the possession of Marquand Gairard, son of the senior partner of B. Gairard Fils, and to destroy them as soon as received. It is true these bills of lading were testified to have been others than those set out in the indictments, and it was shown that the cablegram was sent at the instance of, and in an endeavor to protect, the Austro-American Steamship Company, yet it constituted an attempt on the part of the plaintiff in error Carriere to destroy evidence, and was admissible, certainly, as against him, for that reason. Upon the issue of fraudulent intent the evidence was not confined to the transactions set out in the indictments. Proof of the use of other bills of lading by plaintiffs in error, to cover which no goods were shipped, was competent upon this issue.

[11] (c) The bankers who testified for the government, and who had made advances, were asked whether they would have made advances on the drafts if no bills of lading had been attached to them, or if they had been informed that no goods were shipped to comply with the requirements of the bills of lading, and were permitted to answer in different ways that they would not have done so. The questions were objected to as being irrelevant and calling for expressions of opinion from the witness. In a prosecution under section 215 the government is not required to show that the fraudulent scheme devised was successful, or that the party intended to be defrauded was actually defrauded. It is enough for it to show that the scheme devised was one that was calculated to defraud. The evidence should be considered as directed to the issue as to whether the representations in the bills of lading were of a nature likely to deceive, and not to the issue as to whether the witness was in fact deceived by them in the instant case, as would have been the case if the prosecution had been for obtaining money by false pretenses. The witnesses were bankers, accustomed to dealing in drafts of like kind. Their evidence was, in effect, that bankers purchasing drafts drawn for the purchase price of merchandise, with bills of lading attached, would rely upon the genuineness of the bill of lading, and the representation that the goods had been shipped, as recited by it, in buying the drafts. This did no more than state the course of business among bankers in this respect, and was testified to by witnesses who were experts familiar with the customs of bankers in such matters. We think the evidence was material upon the issue as to whether or not the recitals of the receipt of the staves in the bills of lading were calculated

to deceive purchasers of the drafts to which the bills of lading were attached, and that it was evidence of the effect of such recitals according to the course of business among bankers, rather than the mere opinion of the witness as to the effect of the representation upon him in a specific instance. But if the evidence called for by the questions objected to was subject to the objections made, the admission of it was not such error as would justify a reversal of the judgment. There was other unquestionably competent evidence to support a finding that banks applied to were likely to be influenced to discount drafts accompanied by bills of lading by a reliance on the bills of lading evidencing real shipments of goods. The other evidence disclosed by the record is such as to satisfy us that the exclusion of the testimony in question would not have resulted in a finding different from the one made. It is not reasonably supposable that, in the absence of that testimony, the jury would have failed to conclude from the other evidence adduced that the defendants would not have met with the same success in realizing on their drafts if it had been made known to the banks dealt with that the bills of lading accompanying drafts presented for discount did not represent any actual shipments of goods, and that the means of paying accepted drafts would be obtained from the same or other banks by discounting other subsequently drawn drafts, also accompanied by bills of lading which represented no actual movement of goods. It seems that it would not be going too far to say that it may be treated as a matter of common knowledge that credits or advances by banks based upon what appears to be actual movements of commodities in legitimate commerce would not be as readily obtainable if the falsity of the appearance of reality is made known when the credits or advances are applied for.

[12] (d) The witness Harris was permitted to testify that he personally did not expect to ship the staves when he drew the bills of lading, against objection that this was the statement of opinion of the witness. The answer of this witness was limited to his own expectation, and the context shows that it amounted to no more than a statement that he gave no instructions at the time he drew the bills of lading for the delivery of the staves for shipment. This appears from his testimony that "there had been shipments of staves made against the bill of lading drawn with a letter of guarantee." His testimony as to his own expectation, based on the fact that he had given no instructions to ship, was competent.

[13] (e) The same witness was permitted, against objection, to testify to a conversation between himself and the plaintiffs in error, in which he declined to accept a power of attorney from plaintiffs in error, assigning to them as his reason that he did not think the bills of lading were regular. This evidence tended to bring home prior notice to plaintiffs in error of the irregularities in the bills of lading, and was material upon the question of whether or not they intended to defraud.

[14, 15] (f) The plaintiff in error Carriere voluntarily testified in his own behalf. On cross-examination he was asked by the United States attorney as to the amount of accepted and unpaid drafts outstanding against B. Gairard Fils at the time of the failure of that firm, and also

as to the financial condition of the Liverpool Stave Company, and was permitted to answer, against the objection that it was matter not brought out upon direct examination, and on which he could not be properly cross-examined. The witness had testified on his direct examination to facts tending to sustain the ability of the two firms mentioned to pay their acceptances. It was proper cross-examination to show the amount of such acceptances and any fact tending to throw light on the financial condition of either acceptors. The plaintiff in error having voluntarily offered himself as a witness, the waiver of his constitutional privilege was complete, and the extent and latitude of the cross-examination was a matter for the discretion of the District Judge. Diggs v. United States, 242 U. S. 470, 37 Sup. Ct. 192, 61 L. Ed. 442, L. R. A. 1917F, 502.

[16] 6. The plaintiffs in error excepted to the closing argument of the District Attorney in two respects:

(a) Upon the comment of the District Attorney on the failure of the plaintiff in error Carriere to answer certain questions asked him on cross-examination to which objection had been sustained. The objections were based altogether upon the ground that the matter inquired about was not within the scope of direct examination of the witness. It is contended that comment on his failure to answer was in violation of his constitutional privilege.

In the case of Caminetti & Diggs v. United States, 242 U. S. 470–493, 37 Sup. Ct. 192, 61 L. Ed. 442, L. R. A. 1917F, 502, the Supreme Court, sustaining an instruction given by the District Court, that the failure of the defendant Diggs, who had taken the stand in his own behalf, to explain incriminating circumstances, might not only be commented upon by counsel, but might be considered by the jury, with all the other circumstances, as to his guilt or innocence, said:

"This instruction, it is contended, was error in that it permitted the jury to draw inferences against the accused from failure to explain incriminating circumstances when it was within his power to do so, and thus operated to his prejudice, and virtually made him a witness against himself, in derogation of rights secured by the Fifth Amendment to the federal Constitution.

"There is a difference of opinion expressed in the cases upon this subject, the Circuit Court of Appeals in the Eighth Circuit holding a contrary view, as also did the Circuit Court of Appeals in the First Circuit. See Balliet v. United States, 129 Fed. 689 [64 C. C. A. 201]; Myrick v. United States, 219 Fed. 1 [134 C. C. A. 619]. We think the better reasoning supports the view sustained in the Court of Appeals in this case, which is that where the accused takes the stand in his own behalf, and voluntarily testifies for himself (Act of March 16, 1878, c. 37, 20 Stat. 30 [Comp. St. 1916, § 1465]), he may not stop short in his testimony by omitting and failing to explain incriminating circumstances and events already in evidence, in which he participated and concerning which he is fully informed, without subjecting his silence to the inferences to be naturally drawn from it.

"The accused of all persons had it within his power to meet, by his own account of the facts, the incriminating testimony of the girls. When he took the witness stand in his own behalf he voluntarily relinquished his privilege of silence, and ought not to be heard to speak alone of those things deemed to be for his interest and be silent where he or his counsel regarded it for his interest to remain so, without the fair inference which would naturally spring from his speaking only of those things which would exculpate him and refraining to speak upon matters within his knowledge which might incriminate him."

The District Court, therefore, did not err in permitting comment upon the failure of the plaintiff in error Carriere to answer material questions asked him on cross-examination, which he was prevented from answering by an objection interposed by his counsel upon the sole ground that they did not come within the scope of the direct examination.

[17] (b) The District Attorney's argument was also excepted to because he asked the jury what had become of the large amount of money, represented by the unpaid acceptances, and, answering his own question, said to the jury that he suspected some one of the defendants had gotten a large amount of money from the proceeds of the drafts. The contention of the plaintiffs in error is that this was in effect charging the plaintiffs in error with a separate offense—the concealment of assets from their trustee in bankruptcy. It is equally capable of being interpreted as an argument that the plaintiffs in error had gotten and disposed of the money before bankruptcy. The issue of what was done with the proceeds of the drafts, whether material or not, was treated as being material by both parties. The plaintiffs in error, through their counsel, attempted to show that all the proceeds of the drafts went into the stave business of the plaintiffs in error. The government, through the district attorney, argued that the plaintiffs in error individually benefited by the money, other than their benefit as members of the partnerships. There was evidence in the record from which the jury might have drawn either inference, and it was proper for the district attorney to support by argument the inference of individual appropriation. Whether plaintiffs in error derived benefit from the transactions individually or as partners seems unimportant upon the question of their guilt or innocence.

[18] 7. Complaint is made also of the overruling of the motion for a new trial, but the action of the District Judge on the motion is not subject to review by this court.

No error appearing in the record, the judgment of the District Court is affirmed.