### UNITED STATES v. MILLER.
### No. 155.

Circuit Court of Appeals, Second Circuit.

Dec. 5, 1932.

948

Morris E. Packer, of Brooklyn, N. Y., for defendant-appellant.

Howard W. Ameli, U. S. Atty., of Brooklyn, N. Y. (Donald C. Strachan, Asst. U. S. Atty., of New York City, and Herbert H. Kellogg, Asst. U. S. Atty., of Brooklyn, N. Y., of counsel), for plaintiff-appellee.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The defendant was indicted on five counts. The second and third were dismissed by the trial court, and upon the fourth and fifth there was a verdict of acquittal. By the first he was charged with embezzling and converting to his use certain moneys, funds, and credits of the Kingsboro National Bank of Brooklyn to the amount of $6,300, and upon this count he was convicted. The present appeal is from the judgment of conviction on the first count.

The defendant was an employee of the Kingsboro National Bank, acting as both paying and receiving teller, from December, 1929, until September, 1930. The government sought to prove by circumstantial evidence that cash deposits of the Brooklyn & Richmond Ferry Company, a customer of the bank, which were not entered in its account with the bank when received by the latter, though carried into the monthly statements rendered to the customer, were embezzled by the defendant, and that he attempted to conceal these abstractions by improperly charging amounts, approximately equivalent to the sums stolen, to the accounts of Valuzzi and Persicano, two customers, who had inactive accounts with the bank.

It was the practice of the Ferry Company to deposit its receipts consisting of coin and bills with the above bank. Duplicate deposit slips were made out by an employee of the Ferry Company named Donnelly, and the money was, on week days, left for deposit with the defendant or another receiving teller named Schneider, and on Sundays with a watchman of the bank. The money included a great deal of silver and was deposited in bundles. Schneider took Miller's place as receiving and paying teller when the latter went to lunch or was otherwise absent, but these two men worked in entirely separate cages, and the work of each was separately sent to the bookkeeping department for audit, and the tabulations by that department were carried into the general ledger and the customers' ledgers of the bank. The Ferry Company retained a duplicate deposit slip representing each deposit. At the end of each month a statement was prepared and sent to it purporting to show the condition of its account.

The government introduced evidence showing that Miller received a deposit from the Ferry Company on April 2, 1930, of $695.73 and that he checked the items, as shown by the circular mark which he customarily used in his work. But this deposit was not entered in the books of the bank until April 30, 1930. On the same date a house charge of $500 was made against the inactive account of Valuzzi. This charge would in the course of business originate in Miller's so-called block before being debited to Valuzzi's account by the bookkeeping department. It left no balance in Valuzzi's account, and, when he drew a check on the bank for $400 in September, 1930, the fraud on him was discovered, and his account was reinstated. The government plausibly argues that the improper charge against Valuzzi's account was made in order to cover pro tanto embezzlements by Miller from the Ferry Company's deposits, so that those deposits might appear on the face of things always to have been intact. A deposit of $856.45 was made by the Ferry Company on April 30, 1930, but did not appear on its ledger account in the bank until May 6, 1930. This last deposit was not entered in April or included in the April statement sent to the customer. All other April items were. The failure to enter the $856.45, coming in as it did on the last day of April, did not arouse the suspicion of the Ferry Company.

In May, 1930, there was the same extraordinary lag between deposits of the Ferry Company left with Miller and the entry of them in the books of the bank. A deposit of $940.25 on May 8 was not entered until May 20, and one of $2,846.80 on May 19 was not entered until May 27. Likewise entry of a deposit of $2,352.45 on May 26 was withheld until May 31.

In the same way entries of deposits by the Ferry Company in June were withheld. Deposits of $1,772.20 on June 29 and of $2,884 on June 30 were not entered during that month. Yet these items appeared on the statement for June sent to the Ferry Company. That statement showed a cash balance of $17,968.79 as against a balance shown by the books of the bank of only $13,312.69. Grote, the general clerk of the bank, testified that the balance of $17,968.79 written on the June statement was in Mil-

ler's handwriting. The typewritten item of $2,884 on the statement was plainly written over an erasure. The item $1,772.20 was withheld from entry in the private customer's ledger of the bank until July 3 and the item of $2,884 until July 8. Although entered on the books in the month of July, these items appeared on the customer's statement for June and were not on its July statement.

In July, entry of various deposits was delayed. The deposit of $1,244.40 on July 26, and the deposit of $3,024.40 on July 28, were not credited to the Ferry Company until August 5. Yet these items appear in the statement sent to the customer under date of July 31, and the balance of $10,599.48 in the handwriting of Miller includes them, though they were not entered on the customer's ledger until August 5. According to the books of the bank, the balance to the credit of the Ferry Company at the close of July was $6,330.68 instead of $10,599.48 as shown by the statement rendered to it for that month.

Coming to August, on the 23d of that month, entry of deposits had been withheld to the amount of $5,690.35. The account was credited on August 27, with deposits previously withheld amounting to $4,159.40, and on August 30 with deposits aggregating $1,530.95. But the total of $5,690.35 representing these deposits was, on August 30, more than offset by a false charge of $5,800 to the inactive account of Persicano. The deposits credited on August 27 came through Miller's block, and those credited August 30 were broken down and counted by him, for the slips bore his check mark. Accordingly, a jury might reasonably find that all these deposits were directed by Miller. The improper debit to Valuzzi's account on April 30 came through his block. Fol. 745. Though the block sheets for August 30 disappeared, it is a fair inference that the improper debit of $5,800 to Persicano's account which the bank had to make good enabled Miller to embezzle deposits of the Ferry Company to that extent. Miller went on his vacation on August 30, and, if he had embezzled funds deposited by the Ferry Company, he had to do something to balance the books of the bank so that the credits to the Ferry Company of sums in fact withdrawn would not result in an apparent shortage of cash. It seems difficult to explain the motive for false entries in the statements totaled in June and July in Miller's own handwriting and for the improper charges to the accounts of Valuzzi and Persicano upon any theory consistent with Miller's innocence. Not only is there testimony that the incorrect totals on the June and July statements were in his handwriting, but also that the slips withheld were all in Miller's cage. There was also evidence other than the proof of handwriting that Miller had access to customers' statements.

It should also be noted that $2,884, the last item in the statement for June to the Ferry Company, and $3,024.40, next to the last item in the July statement, were plainly typewritten over erasures of other sums, and that neither of these items was entered in the private customer's ledger of the bank until the succeeding month. On the August statement, the erroneous balance shown by the July statement was brought forward and put in over an erasure. These erasures and the insertions in the statements for June and July of items belonging to the succeeding months, necessary to make up the footings in Miller's own handwriting, tend to connect him with the shortage of funds of the bank. The mere fact that the books of the bank and the Ferry Company's August statement showed a correct balance, and that at the end of August no deposits appear to have been withheld, does not exculpate Miller. The statement sent to a customer with an active account had to be at least substantially correct, and could not long show a balance differing from the books of the bank, or exposure would have been prompt and inevitable. A likely method of postponing detection was to charge misappropriations to inactive accounts. This apparently was done, and the jury were justified in finding that the persistent withholding of deposits from entry, the erroneous statements which did not correspond with the books of the bank, the erasures on these statements, and the false charges to the accounts of Valuzzi and Persicano were all part of a scheme on the part of Miller to conceal his misappropriations.

Miller's attempt to extricate himself from this webb of incriminating evidence consists of little more than a flat denial of personal misappropriations and testimony that people in the bank, other than himself, had an opportunity to abstract cash and make false entries. This seems to us a lame defense when false totals in Miller's own handwriting appear upon the June and July statements and there is proof that the deposits in question were made in Miller's cage and checked by himself. The contention that some one else might have taken cash from the defendant's own cage is of little force, for any shortage due to such abstraction would have been noticed by him in his daily check.

The jury who heard the testimony were the proper judges of the truth or falsity of Miller's testimony, and there was ample warrant for their finding of his guilt.

Error is assigned because Roche, an agent of the Department of Justice, was allowed to testify as an expert and at one place in his testimony to state his opinion that various amounts were embezzled by "an employee of the bank." Roche had studied accounting at Pace Institute in Washington and in the University of Southern California, altogether for about three and one-half years. He had previously conducted investigations of various banks. Whether he was a properly qualified expert was a question primarily for the trial court, and enough was shown to justify the admission of his testimony as such. Chateaugay Ore & Iron Co. v. Blake, 144 U. S. at page 484, 12 S. Ct. 731, 36 L. Ed. 510; Canal Const. Co. v. Henson (C. C. A.) 280 F. 98, at page 99.

The judge cautioned the jury that the statement by Roche of his conclusion as to what the records in evidence indicated was only his opinion and "not a scientific fact." It may be that Roche somewhat exceeded the proprieties in expressing the view that the records of the bank showed embezzlements "by an employee," but the evidence certainly showed misappropriations by some person, and, because of the way a bank's business is conducted, they were much more likely to be by an employee than by an outsider. At any rate, the mere expression of the opinion amounted to no more than an argument, and was not reversible error.

The judgment is affirmed.