**UNITED STATES v. KELLEY et al.**

Nos. 268, 269.

Circuit Court of Appeals, Second Circuit.

July 17, 1939.

Nathan Probst, Jr., of New York City (Carl E. Alper and Ruth R. Kessler, both of New York City, of counsel), for Kelley.

Irving M. Radin, of New York City, for Rabner.

Jules J. Lubasch, of New York City, for Greer.

John T. Cahill, U. S. Atty., of New York City, Earl C. Crouter and Joseph W. Burns, Sp. Assts. to Atty. Gen. (J. Randall Creel, Asst. U. S. Atty., of New York City, of counsel), for the United States.

Before L. HAND, SWAN, and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

The chief appeals are from a judgment of conviction of the three accused under two indictments, consolidated for trial, for assisting in the preparation and presentation of fraudulent income tax returns for the years 1929 to 1932, inclusive. One indictment concerned the partnership returns of Ringling Bros.-Barnum & Bailey Combined Shows; the other those of the estate of Charles E. Ringling, who died December 3, 1926. During the years in question the partners and the executors of some who were dead were the owners of this well-known circus, and Kelley was, and for many years had been, their legal adviser; to him was entrusted the preparation of

914

the firm income tax returns from at least 1917 forward. In or about 1923 he employed as an assistant one, Rabner, at one time a Treasury agent; and in 1929 Greer, another Treasury agent. The frauds consisted of deductions taken from the gross income. They were of several kinds; one was for the depreciation or abandonment of the circus property; another was the write-off as a bad debt of a claim against one, Rickard; there were others which we shall not discuss. With the two indictments upon which the accused were convicted, the government consolidated two conspiracy indictments, charging, not only the three accused now before us, but five others in all, against whom the prosecution was severed at the beginning of the trial. The jury acquitted the accused upon the conspiracy indictments. The issues raised upon the appeals from the conviction are (1) that it was an error to consolidate the four indictments; (2) that the taxpayers (the representative of the partners, and the "estate" of Charles Ringling) were not proved to have been guilty of any fraud, without which the accused could not have been themselves found guilty; (3) that incompetent documents were admitted and the incompetent opinion of revenue agents received; (4) that the admission of the partners' books against Kelley was erroneous; and (5) that the evidence did not support the verdict.

The minor appeal is by Kelley alone from an order denying a motion for the return of papers seized before trial. During the preparation of the case two Treasury agents obtained possession of papers in the cellar of a building leased by a corporation which had succeeded to the partners' circus business. Kelley asserted that some of these were his personal property and that he had never lost possession of them, and he moved before trial to compel their redelivery. This motion was denied, but when the documents were offered in evidence at the trial, he again objected, and the issues were once more heard, this time by the trial judge, who also ruled against him. The first order was not independently appealable, being an interlocutory step in the prosecution. The motion was made after all the indictments had been found but one, and that one superseded another which was itself earlier than the motion. Thus "the main purpose" was the "suppression of evidence at the forthcoming trial" and "in essence, the motion" resembled "others made before or during

a trial * * * to suppress evidence." Cogen v. United States, 278 U.S. 221, 223, 49 S.Ct. 118, 119, 73 L.Ed. 275. However, though not independently appealable, Kelley may bring up the ruling as an incident to this appeal, just as he may bring up the same ruling made upon the trial itself. We must therefore consider the merits. The cellar where the papers in question were stored, contained a number of boxes filled with papers to which the two Treasury agents were given access by one, Wadsworth, then in charge of the corporation's books. According to the testimony of Ducker, the survivor of the two agents, no box was marked so as to distinguish it from another; and all were indiscriminately filled with papers, of which they took possession, and from which they sorted out those they thought material. Kelley's story was that with the consent of the corporation he had left in the cellar a box of private papers, marked on the cover, "John M. Kelley," that this remained in his possession and the agents invaded it without his consent. He was corroborated as to the box by one, Griffin, an employee of the corporation whom Wadsworth had sent down into the cellar along with the Treasury agents. Wadsworth had never heard of such a box, although he had had occasion from time to time to go to the cellar and examine the records kept there. Upon this testimony both the judge at the preliminary hearing and the judge at the trial, who had each heard the witnesses, found that there was no such box; and that finding is conclusive, quite aside from the exceedingly dubious question whether Kelley would have remained in possession of a box so stored, even if it had been marked as he says.

In order to understand the points of law on which the main appeal turns, it is necessary to state the facts at a little length. The returns took deductions for depreciation yearly from 1929 to 1932, based upon an inventory—Ex. 89—made by Kelley, either during or before the year 1923, but calculated as of 1918. He admitted to one of the Treasury officials in charge of the inquiry that this inventory had been made up from three others, found in a loft at Sarasota, Florida; two of which were made in 1913, and one, in 1911. Most of the items upon these three were contained in Ex. 89. The prosecution proved in a number of ways that this inventory (Ex. 89) was fabricated; one, by comparing it with the three inventories just mentioned;

another, by comparing it with inventories of the estates of four dead partners, which had been filed in the probate proceedings, one in March 1911, another in January 1916, a third in October 1918, and the fourth in October 1919. The padding was both in the number of items contained— e. g. cars, wagons and animals—and in their value. Several witnesses, including some who had formerly been employed by the circus, testified to the number of animals and wagons which it had had while they were with it, and to their cost. The accused answer that this did not take into account the money used to repair the wagons and to train the animals, which should be added. But these were, or at least it was fair to argue that they were, expenses of the business, and were taken out of the gross in the year in which they were incurred. Certainly it was improper, having once been so taken, that they should be taken again as depreciation. Again, there had originally been an item of "Autos and trucks" of about $51,000, which by the end of 1928 had been substantially all written off through depreciation. Rabner wrote to Kelley in June and July of that year that it would be necessary that additional purchases should be shown in the inventory for 1927, in order to get proper depreciation charges. This was done. Again, Wadsworth, who became auditor at the beginning of 1930, prepared the depreciation schedule for that year (Ex. 380) based upon a similar schedule in 1929 which had been given him by either Kelley or Greer. This showed a total depreciation of about $49,000. Greer, raised this by exactly $100,000 and upon the witness stand, could not explain why this was done. In the same year Kelley instructed Greer to raise the gross of this inventory by $200,-000 or $300,000, and Greer fabricated plausible items to fetch it up by about that much.

In 1929 one, Rickard, who owed the partners a debt of $50,000, died, and his estate was known to be insolvent. Kelley and Greer deducted the whole debt twice by elaborate concealment. One, DeWolfe, had prepared a statement of the net income for the year, charging the partners with a total gross of about $4,000,000, and taking deductions which included accounts receivable of about $103,000. The accounts were obviously not proper deductions for income tax purposes and had to be deleted, but only $21,000 was subtracted instead of the full figure, $103,000. This resulted in taking as deductions the Rickard debt and an

item of about $32,000, known as "J. M. K. Expense Account". From the income so computed the Rickard debt was a second time expressly deducted as a bad debt. In the year 1931, the Rickard estate paid half the debt, and, in the return for that year also, the difference, $25,000, was deducted as a bad debt. It is true that the deduction on the 1929 return of $50,000 as a bad debt was disallowed on July 15, 1930, because the debt had not been written off the books, but the attempted fraud was as great as though it had been successful. Moreover, the full amount of the debt having been deducted in that year in making up the net income, it was a second fraud to deduct one half of it again in 1931. By this chicanery a fraudulent credit was thus secured of $50,000.

There was other evidence that the returns were fraudulent, but it is not necessary to set it forth, because it is apparent from the foregoing recital that there was ample to justify a jury in so finding. There was also ample to connect the accused with their preparation and presentation. Greer was in charge of the books during the years in question and his complicity is too plain to justify any discussion; indeed his own testimony fastened his guilt upon him. It would be absurd to suppose that he should have originated the fraud himself; Kelley was in charge of all such matters for the partners and their estates, and was the only person at once capable of dealing with them, and having any motive to rig the returns. Moreover, Greer repeatedly said that he got figures from Kelley with instructions as to how to use them. As to Rabner, his letters to Kelley in June and July, 1928, about the necessity of fabricating a new item of $50,000 for autos and motor trucks to replace that which had been exhausted by previous depreciation, showed his complicity in the fraud. This was to swell the inventory which he knew was to be used in future years until by depreciation the new item should be exhausted as the old had been. Moreover in 1932 he was still concerned with the preparation of the returns as his letter—Ex. 234—disclosed, in which he advised Kelley how to make up the depreciation schedule from the 1926 purchases. Add to this his attendance at conferences in Washington in 1931 and 1932, when the Treasury officials were induced to pass some of the items, and it plainly appears that he was working with Kelley throughout the whole period. The point is made that he was never in the

Southern District of New York, and could not therefore have assisted in the preparation of the returns as alleged. It would be enough answer to this to recall that the letters were sent to New York, and that they were themselves an act of assistance. But we do not distinguish in this respect between the crime of aiding in the preparation and presentation of a return, and that of preparing and presenting the return. If Rabner had been indicted for preparing and presenting the return, it would have been no answer to say that he abetted that result from outside the district. Horner v. United States, 143 U.S. 207, 12 S.Ct. 407, 36 L.Ed. 126; Burton v. United States, 202 U.S. 344, 387–389, 26 S.Ct. 688, 50 L.Ed. 1057, 6 Ann.Cas. 362. He could have been tried wherever his acts resulted. When the preliminary steps are made themselves an independent crime, it is possible logically to distinguish and say that the indictment must be found where those steps occurred, and if so, that each participant is chargeable only where his part is performed. But the practical result would be to subject the two crimes which are essentially the same, to different rules of venue, and that is an absurd intent to ascribe to Congress. We think the same rule applies as though the crime charged were the very preparation and presentation of the return.

■ Since therefore there was enough to connect all the accused with the fraudulent returns, we may turn to the supposed errors in the conduct of the trial. The first of these is the consolidation of the four indictments. One of these was for a conspiracy to defraud the United States of income taxes due from the partners and from the estates of those who were dead. The period covered was 1918–1932, and there were six defendants, of whom three were the accused at bar. The other conspiracy indictment was of the same kind except that it was confined to the return for the estate of Charles Ringling for 1929. The defendants in this were the accused at bar and two others not made defendants in the first conspiracy indictment. The two substantive indictments we have already described. The only defendants in one were the three accused at bar; those in the other were those three and a fourth. At the beginning of the trial when the indictments were consolidated, the prosecution was severed as to all but the accused at bar; and the question is whether they were prejudiced by this procedure. Had the conspiracy indictments covered only the years, 1929–1932, there

could not have been the slightest ground for saying so. In that event the substantive crimes would have been merely steps in a crime—defrauding the Treasury out of taxes—and any evidence which was admissible to prove the conspiracies, would have been admissible to prove the substantive crimes. The fact that there would have been other defendants in the conspiracy indictments would not have prejudiced the accused, so far as we can see. The declarations of a fellow conspirator are competent only when made in pursuance of the common object; they are admitted because they are a part of the execution of the plan, and have been impliedly authorized by the others. Wigmore, § 1079. The fact that declarant is indicted adds nothing to the competence of his declaration. Besides, the record at bar contains substantially no declarations of any persons indicted in the conspiracy indictments, who had been severed out at the trial. Such prejudice as there was, was therefore due to the fact that the conspiracy indictments included eleven years before 1929. But the fraudulent returns for 1929–1932 were a continuation of practices that had been in continuous operation since 1918, and the principal fraud was in the padding of the original inventory—Ex. 89. Had the substantial indictments alone been tried, this padding must have been proved, and could legally have been proved, as a preliminary to showing the continued use of it thereafter. It is difficult to see what could not have been proved that was material to the conspiracy indictments; but if there was any such evidence, it was certainly competent under the doctrine that where intent is in issue, other instances of the same kind may be adduced.

■ No prejudice to the accused being therefore involved, the question comes down to whether there is any peremptory rule which forbade such a consolidation. We think not. We will assume for argument that the consolidation statute (section 557, Title 18, U.S.Code, 18 U.S.C.A. § 557) does not allow the joinder of two indictments, in one of which the accused include some who are not accused in the other. Even so, the severance did away with that objection, so far as the statute gave any practical protection to the accused. It is true that the opposite has been held. DeLuca v. United States, 2 Cir., 299 F. 741; Castellini v. United States, 6 Cir., 64 F.2d 636. However, both these cases depended

chiefly upon McElroy v. United States, 164 U.S. 76, 17 S.Ct. 31, 41 L.Ed. 355, and that decision does not bear them out. The court had there before it the consolidation of four indictments in which not only were the accused different, but which concerned quite separate crimes. There was no severance, and the court thought the crimes so disparate that justice could not be done, if they were tried together. Nowhere did it suggest that if only the accused common to all the indictments had been tried, and if the crimes were closely interwoven, the conviction would not have stood. We can discover no basis for any peremptory rule forbidding such a joinder, and so far as DeLuca v. United States, supra, so holds, we overrule it. For the same reason we cannot follow Castellini v. United States, supra, in that regard. Moreover, even if the consolidation had been technically an error, it would not have been ground for reversal. Section 391, Title 28, U.S.Code, 28 U.S.C.A. § 391.

■ The next point is that the crime of assisting in the preparation of a fraudulent tax return presupposes that the taxpayer himself is a party to the fraud, and that this was not proved. Whatever embarrassment that might have caused, had the accused been charged as abettors of the partners and their executors, it is quite immaterial here, because the statute (section 1114 (c) of the Revenue Act of 1926, 26 U.S.C.A. § 1693(b) (1), expressly provides that the assistance shall be a crime "whether or not such falsity or fraud is with the knowledge or consent of the person authorized * * * to present such return." The purpose was very plainly to reach the advisers of taxpayers who got up their returns, and who might wish to keep down the taxes because of the credit they would get with their principals, who might be altogether innocent.

■ The trial, which occupied eight weeks, was an almost continuous barrage of objections to the admissibility of evidence, oral and written, generally preceded by preparatory cross-examination of the prosecution's witnesses to ascertain their qualifications to testify. It is quite impossible to deal with even a small part of these objections; we must content ourselves with the only one in which we think that error was committed—Ex. 85. That was an inventory, prepared in 1935 by Treasury accountant, purporting to contain a correct statement of the property of the corporation as of that time. The items entered upon it appear to have been noted down by the two accountants from personal knowledge, gained on the ground, and we can see no reason why the document was not pro tanto competent. However, the values set opposite the items, though likewise gathered on the spot, were, in part at any rate, gleaned by inquiry from unascertained persons, who may or may not have been qualified, and who certainly were not called. So far it was incompetent, and the values should have been excluded. However, it is inconceivable that this error should have controlled the verdict. The inventory referred to a time three years after the last return in controversy, and the use made of it does not appear. At worst it would have done no more than show discrepancies between the inventory of 1935 and the earlier years, and there was so much evidence of specific fabrication as would make a reversal for this reason a travesty of justice. Objection was made to the partners' books on the ground that they had not been properly proved. They were shown to have been kept in due course, and were clearly competent, if section 695 of Title 28, U.S. Code, 28 U.S.C.A. § 695, covered them. It did unless subdivision h prevented, which says that the section as a whole shall not be "retroactive". Valli v. United States, 1 Cir., 94 F.2d 687, 693; and Greenbaum v. United States, 9 Cir., 98 F.2d 574, 577, hold that this subdivision requires the documents themselves to have been made after the section was enacted; but in Hass v. United States, 8 Cir., 93 F.2d 427, 437, the opposite opinion was expressed obitor, and with that opinion we agree. Surely Congress could not have supposed that the time at which the records were made was important; the section contained nothing which insured their accuracy; it merely provided that they must be kept in the regular course of the business, and that assurance was as good before the statute was passed as after. Nor is it in the least necessary so to read it; it may mean—and we think it does mean—that the section shall not serve to correct a mistake made at trial in the exclusion of records, which were kept in regular course, but were not competent as the law then stood. This is the natural and almost necessary meaning, for otherwise no records actually made before June 20, 1936, will ever have the benefit of the relaxation of the former strict requirements. Strictly the question does not, however, arise because the books

918

were not used as evidence of the truth of what they recorded. The accused themselves accepted them as correct and made use of them in preparing the returns. It was the disparity between them and what was prepared from them that made up a substantial part of the frauds charged. Their objective verity could be material only on the very refined theory that they might have so far overstated the income of the circus that the returns, though fraudulently compiled, turned out not to be too low. Even so, the returns would be fraudulent, for they would be deliberately incorrect, though the tax shown was not too small.

The prosecution's accountants were allowed to present their calculations from the books and returns in evidence. This kind of evidence when based upon documents themselves competent and accessible, is always admissible; a jury without such guidance would be totally unable to cope with complicated accounts. Burton v. Driggs, 20 Wall. 125, 135, 22 L.Ed. 299; Rollins v. Board of Commissioners, 8 Cir., 90 F. 575, 583; United States v. Miller, 2 Cir., 61 F.2d 947; Wigmore § 1230.

Complaint is also made of the charge, or rather of the judge's refusal to give certain requested instructions, for no exception was taken to the charge itself. About 100 such requests were made which even in so long a case was an inordinate number; we should not therefore in any case be disposed to hold down the judge too closely. One was the conventional request regarding the testimony of witnesses to the reputation of the accused, drawn from Edgington v. United States, 164 U.S. 361, 366, 17 S.Ct. 72, 41 L.Ed. 467. Perhaps the judge forgot this request; perhaps he deliberately refused it; at least he said nothing about it. He was right in any event, for he was not required to give it. All that that decision held was that if a judge undertakes to say anything to the jury about such testimony, he must not tell them to use it only in case the scales are already in balance. If he chooses not to speak of it at all, he is free not to do so, for it is like any other testimony; and whether he shall comment upon it lies wholly within his discretion. Le More v. United States, 5 Cir., 253 F. 887, 894; Grace v. United States, 5 Cir., 4 F.2d 658, 662; Allen v. United States, 7 Cir., 4 F.2d 688, 695; Kreiner v. United States, 2 Cir., 11 F.2d 722, 725; Nash v. United States, 2 Cir., 54 F.2d 1006, 1007.

The only other matter in the charge that needs comment arose from a fact to which we have as yet only alluded. The returns included among the deductions taken, losses due to the abandonment of some of the circus property at Baraboo, Wisconsin and Bridgeport, Connecticut; and also due to the "abandonment" of certain "spectacles", so called. Although the statute does not expressly allow such deductions, the regulations have done so for a long time; i. e., when property has been "permanently abandoned or permanently devoted to a radically different use". Reg. 68 Art. 23(e) (3). The prosecution asserted that the putative abandonments were fraudulent, and the judge in dealing with the matter told the jury that effect must be given to the regulations and that " 'abandonment' is an absolute relinquishment or renunciation of property, or a right therein;" later, that "if the use of any property in the business is permanently discontinued although no sale or disposition of the property has taken place" a deduction might be allowed, "for the loss of useful value * * when such property is permanently discarded due to some unforeseen cause. This applies to the buildings only when they are permanently abandoned or permanently devoted to a radically different use." So far the charge was correct and adequate. In the next paragraph, however, apparently forgetting what he had just said, he added that "relinquishment of title is a necessary condition precedent to deduction of losses on abandonment of real estate"; and that was obviously an error. He would probably have corrected it if it had been called to his attention, but it was not. Instead, the accused, apparently preferring to leave with the jury the impression that the judge favored them in all respects, did not except, but relied upon a request, which did indeed state the law correctly, but added an unwarranted instruction about the effect of some evidence touching the value of the property at Baraboo. Because of this addition the judge was right to refuse this request; and he was right anyway, because his charge had already covered it. If the accused had any grievance at all, it was in what the judge had said about title; and the proper remedy for that was to call his attention to the inconsistency, and except if he refused to correct it.

Convictions affirmed.

Appeal from order denying redelivery dismissed.